GEORGE W. CLINKENBEARD, Appellant, v. CITY OF ST. JOSEPH and ST.
JOSEPH RAILWAY, LIGHT, HEAT & POWER COMPANY.—10 S. W.
(2d) 54.

Division One, October 3, 1928.

72

*Lindsay & King* for appellant.

*Richard M. Duncan* and *William Norris* for respondent city; *Charles H. Mayer* and *Roscoe P. Conkling* for respondent company.

SEDDON, C.—Plaintiff seeks to recover damages in the sum of $15,000 from the defendant municipal corporation and the defendant utility corporation for personal injuries alleged to have been suffered by him and to have resulted from the collision of an automobile (which he was driving) with a tall, wooden pole upon which were strung several electric lighting circuit wires, and which pole was owned and maintained by defendant utility corporation in a parkway contiguous to the paved and improved roadway of a public street within the corporate limits of defendant municipality. At the conclusion of the evidence upon a trial of the action, the trial court gave a peremptory instruction, in the nature of a demurrer to the evidence, directing the jury to return a verdict in favor of both defendants; whereupon, plaintiff took an involuntary nonsuit with leave to move to set the same aside, and suffered a judgment to go against him. After an unsuccessful motion to set aside the involuntary nonsuit taken and the judgment entered thereon, plaintiff was allowed an appeal to this court.

The undisputed facts disclosed by the evidence are these: Ashland Boulevard is a public street or highway within the corporate limits of the city of St. Joseph extending in a northeasterly and southwesterly direction. Osage Street is also a public street in said city extending in an easterly and westerly direction, and its eastern terminus ends at Ashland Boulevard. About 245 feet northeasterly of the intersection of Ashland Boulevard and Osage Street was an unpaved, winding roadway, extending toward the west from Ashland Boulevard, known as Crescent Drive. Prior to the year 1908 or 1910, the north corporate limit of St. Joseph extended to the intersection of Ashland Boulevard and Crescent Drive, but thereafter the corporate limit of the city was extended northwardly, so as to include Ashland Boulevard for some considerable distance north, or northeasterly, of its intersection with Crescent Drive. The evidence discloses that the place in question is located within a residential district, or section, of the city of St. Joseph. On the westerly side of Ashland Boulevard, extending a distance of some 245 feet between Osage Street and Crescent Drive, was a parkway approximately 17.3 feet in width and 245 feet in length. North, or northeasterly, of Crescent Drive, the paved and improved roadway of Ashland Boulevard was a uniform width of thirty-six feet from curb to curb. Opposite the aforesaid parkway, and south of Crescent Drive, the improved and paved roadway of Ashland Boulevard narrowed to approximately twenty-four feet, or perhaps less, from curb to curb, leaving what is referred to in the evidence as a "goose-neck" along the easterly side of said parkway. The condition aforesaid had existed for about twenty-five years prior to the accident in question. The aforesaid parkway was separated from the paved roadway of

Ashland Boulevard by a curb, some six or eight inches in height above the level of the street pavement, which curb extended along the northerly and easterly sides of the parkway the entire length of the parkway, or approximately 245 feet. Grass, trees and other vegetation were planted and grew within the parkway, and on the westerly side of said parkway was a brick sidewalk for pedestrian use. Near the northeast corner of the parkway, and inside of the curbing thereof, the defendant utility company maintained a cedar pole, about ten or eleven inches in diameter and extending about thirty-four feet in height above the level of the parkway, which is referred to in the record as an "electric light pole." Plaintiff, by his own testimony, fixed the location of the aforesaid pole as being "about a foot" west of the east curb of the parkway and "about three feet" south from the north curb of the parkway. There was some evidence that other similar electric light and telephone poles were located in the parkway and inside the curb enclosing said parkway, but the evidence is not clear whether the telephone poles were removed from the parkway before or after the date of plaintiff's alleged injury.

Plaintiff testified that, between eight and nine o'clock on the evening of August 19, 1925, he was driving alone in a Ford roadster automobile south upon Ashland Boulevard and ran his automobile over the north curb of the aforesaid parkway into the electric light pole owned and maintained by defendant utility corporation in the northeast apex of the parkway, thereby sustaining the injuries for which he seeks recovery.

His testimony on direct examination is as follows: "Q. About what time of day was it you were driving along there? A. Between eight and nine o'clock. Q. Morning or night? A. Night. Q. Was it after dark? A. Yes, sir. Q. What was the condition of the weather? A. It had rained a little. Q. Were the lights on your automobile burning? A. Yes, sir. Q. Was it raining enough so that you couldn't see? A. No, I could see. Q. On which side of Ashland Avenue were you traveling—which direction were you traveling? A. South. Q. Which side of the street were you on? A. About the center of the street. Q. Do you know whether you were more to the right, or to the left, side? A. I was a little more to the right, I believe, than to the left. Q. At the time you were injured, or just prior to that, about how fast were you traveling, if you know? A. I judge twelve or fifteen miles an hour. Q. Were you able to see along the sides of the street as you traveled along there? A. Yes. Q. Were you familiar with the places along Ashland Avenue? A. No, sir, I was not. Q. Are there trees growing along the west side of Ashland Boulevard? A. Yes, sir. Q. What

happened—what caused your injury? A. I ran into that electric light pole. Q. On which side of the street is that? A. About the center of the street. Q. I mean which side of the roadway? A. On the right-hand side as I was traveling south. Q. That would be the west side of Ashland Boulevard? A. Yes. Q. Before you ran into this light pole which side of the street were you driving on? A. I was on the right. Q. About how far do you think you were out from the curb line? A. Almost the center of the street. Q. What position is that pole in the street as you were driving down Ashland Avenue? A. Straight ahead of you. Q. Were you driving in the usual place in the street that people use? A. Yes. Q. Did you see any warning sign on this pole, or around there anywhere, before you ran into it? A. No. Q. Was there a light burning there? A. No, that light was out. Q. From where you were just before you struck this pole, tell the jury whether or not you could see on through there? A. Yes, I thought I could see on through; thought the road was clear. Q. Are there any lights further on out in the street? A. Yes; I don't just remember whether there is any around that point there or not. Q. Did you see this pole before you ran into it? A. No. Q. How far is it from the curb line west to this pole? A. I judge about a foot. Q. About what was the distance from the north end of this curb line back to that pole? A. About three feet, I judge. Q. Are there any trees growing along the west side of Ashland Avenue that extend out towards this pole? A. Yes. Q. Does that in any way interfere with seeing the place? A. Well, it might; I don't know. Q. What was the color of this pole? A. It was brown. Q. State what effect, if any, the rain would have on this pole with reference to your being able to see it, if it did have any effect at all? A. Make the pole look like the pavement. Q. In what way? A. Changed it enough so I didn't see it; looked both alike, pavement and pole, too. Q. When you were driving down this street just before you were injured, where were you looking? A. I was looking at the center of the street."

Cross-examination: "Q. Did you often go or come back by way of Ashland Avenue? A. Yes, sir. Q. You had done that in the daytime lots of times, I suppose? A. Oh, yes. Q. So that you were more or less familiar with Ashland Avenue? A. Well, yes, some. Q. That is, you had driven over it frequently? A. Oh, yes. Q. Had you ever driven over it during the nighttime before this night? A. Yes, sir. Q. Of course, you had driven a car in the rain before? A. Yes, sir. Q. And you knew that the rain made it a little more difficult to see? A. Yes. Q. Your lights were burning good, were they? A. Yes, sir. Q. Were they throwing light forward as far as lights usually do in a rain of that kind? A. Yes, sir. Q. What kind of light did you have on your car?

A. Magneto light. Q. You knew about how far it would throw light forward? A. Yes, sir. Q. Of course, this curbing that went around this corner was white curbing; that is, it was just white stone? A. Yes, sir. Q. Did you make any effort to stop your car at all? A. I checked up before I got to this place; I kind of slowed down a little; I never drive fast. Q. You slowed down a little before you got to that place? A. Yes, before I thought I was to the place. Q. Why did you slow down? A. I knew I was pretty close to this place. Q. You knew there was such a place there in the street? A. Yes, sir. Q. You were familiar with it? A. Yes, sir, I knew it was there. Q. You had seen it there a good many times? A. Yes, sir. Q. And knew it sat out in the street some fifteen feet, or such a matter, if the street were extended the same width south of Crescent Drive that it was north of Crescent Drive? A. Yes. Q. Before your car hit this pole, of course, it had climbed up over this six-inch curb? You had gone up over the curb? A. Oh, yes, of course. Q. You didn't try to stop your car at all? A. I didn't . have time; I sure would if I had had time. Q. What I am getting at is, you didn't see the pole until you were right on it? A. No, sir, not until I hit it. Q. And didn't see the curb at all? A. No, sir. Q. Well, do you mean by that that you were driving this car and looking for this pole, but it was so dark you couldn't see the pole? A. I was looking out for it, yes sir; looking out for this place. Q. That is, you knew that this corner stuck out there in the street and knew there was a pole there? A. Yes, sir. Q. And you were looking for it? A. Yes. Q. Yet you tell the jury that, even though you were looking for that corner, you couldn't see it? A. I could see good enough to drive. Q. But suppose a man had walked out in the street, would you have run over him, or could you have seen him? A. I don't know about that. Q. How far ahead could you see with your lights? A. I could see fifty feet, I expect; forty or fifty. Q. What would you have to have in order to see it—a house, or what—this pole was bigger around than a man, wasn't it? A. Yes. Q. And you could see ahead fifty feet, you think? A. Well, I couldn't say for sure about that; I could see quite a little piece. Q. About twenty or twenty-five feet? A. Yes. Q. You could stop your car in less distance than that going at the rate of twelve or fifteen miles an hour? A. Yes. Q. How quickly could you have stopped your car? A. Almost suddenly. Q. In six or seven or eight feet? A. Something like that, yes. Q. You have lived here nine years? A. Yes. Q. You had been familiar with that situation there during pretty near that whole time? A. Yes, sir. Q. Did you see the curb? A. Yes, I could see the curb now and then. Q. But you couldn't see this curb? A. No, sir. Q.

What curb was it you did see? A. I could see the curb on each side of me as I drove along. Q. Well, the lights on the car would make it easier to see forward, one ahead of you, than one out to the side? A. Well, I couldn't see that. Q. But you could see the curbs on each side? A. I could see the curbs on the outside. Q. You could see the curb on each side of the boulevard before you got to Crescent Drive, going along the boulevard? A. Yes. Q. On the west side of the boulevard? A. I stayed virtually in the center of the street to keep from running into the curb. Q. Could you see the grass along the parkway? A. No, sir, I couldn't see that. Q. Did you look for it? A. No. Q. Did you look for the post? A. I just looked ahead. Q. Were you looking down at the street, or looking up high? A. I was looking ahead, like a man would be driving along, you know. Q. Did you see any trees along out at the side there? A. I didn't pay attention to the trees; I was watching which way to go. Q. Did you see any trees in front of you as you were going down there approaching this narrow place in the street? A. No, I don't think I seen any trees. Q. Did you see any vegetation at all? A. No, sir, I didn't. Q. Did you see any houses? A. I could see houses along, yes. Q. Did you see any houses at this place? A. Yes. Q. When did you commence looking for this place? A. Quite a ways back. Q. At the time this happened, did you know just where you were going in Ashland Avenue with respect to this corner? A. I knowed I was somewhere near, close to this bad place, but I didn't know how close. Q. Did you, at that time, know how far this curb line extended out into Ashland Avenue? A. Not exactly, no. Q. Did you know it extended out as far into Ashland Avenue as you were with your car? A. I thought I was over far enough to just about miss it. Q. Now the pole itself, tell the jury what color it was? A. Brown color. Q. What color was the street itself, the pavement? A. It was brown. Q. State what there is around this pole there, if anything. A. There is a curb around it. Q. State whether or not there are any trees, or anything like that. A. Yes, there are a few trees around there. Q. Could you tell the jury whether or not those trees shade the street around where this pole is? A. They extend over. Q. You say you thought you were far enough out in the street to miss this place? A. Yes, stayed out towards the center. Q. So if you had wanted to you could have driven twenty feet farther over and missed it entirely? A. I don't know how much farther over it is to the pavement. Q. You could have driven over? A. I might have missed it. Q. Of course, this pole was not painted? A. No, sir. Q. Neither was the curb? A. No, sir. Q. When you say it was brown, you mean it was the color rain would make a stone curb or wooden pole

that was not painted? A. Looked brownish. Q. That night you didn't see any trees, did you? A. I never paid any attention to the trees."

There was some evidence that the curb separating the parkway from the paved roadway was "red sandstone," and several witnesses testified in plaintiff's behalf that there were no reflectors, lights, or barricade around the pole to indicate its presence, and that it was difficult for a person driving along the paved roadway at night to see the parkway, its surrounding curb and the pole within the parkway.

Plaintiff's evidence furthermore tended to show that, on June 30, 1916, the city of St. Joseph had enacted an ordinance to open and widen Ashland Avenue, by a condemnation proceeding, and to remove the parkway between Osage Street and Crescent Drive so as to make the roadway of Ashland Boulevard a uniform width of thirty-six feet, both north and south of Crescent Drive, and that, on September 3, 1919, the city had enacted an ordinance appropriating a sum of money sufficient to pay the damages assessed for the condemnation of the parkway; that the Park Department of the city had caused to be placed upon the pole in question, at different times, two "slow signs," and that the sign last placed upon the pole had been torn down about a year before the accident in question and had not been replaced; and that residents in the locality had appeared before the Park Department of the city, on at least one occasion prior to plaintiff's injury, urging that the parkway be removed and that the street be widened to conform to the enacted ordinances of the city and to the width of the roadway north of Crescent Drive. The work of removing the parkway and widening Ashland Boulevard was not begun by the city, however, until some eleven days after the accident in question.

The evidence of defendants tends to show that, in anticipation of the ultimate removal of the parkway and the widening of the street, and in the month of May, 1925, the defendant utility company had removed all of its own wires from the pole in question, and from other poles within the parkway, and had placed them upon poles which had been erected on the east, or opposite, side of Ashland Boulevard, but that the pole in question had not been removed at that time because the city of St. Joseph was using the pole to carry three or four wires which the city used for its arc street-lighting system; and that the pole in question, with which plaintiff's automobile collided, was carrying the city's street lighting wires on the night of the accident. Witness Dunn, line superintendent of the defendant utility corporation, testified that "the city had wires on it (the pole) and we couldn't take it down until they (the city) took their wires off," and that the pole was removed from the parkway

"some time along about the last of August, 1925." The Superintendent of Parks of defendant city testified that the city started to tear up the brick sidewalk within the parkway, preparatory to removing the parkway, on August 31, 1925, and that some time during "the week previous" to August 31, and after the accident in question, the defendant city had notified the defendant utility corporation to remove its poles from the parkway. Subsequently, in the fall of 1925, the work of removing the parkway was completed and the roadway of Ashland Avenue was paved and improved to a width of thirty-six feet. Evidence was educed by plaintiff to the effect that, while the defendant city maintained an electric arc light at the intersection of Ashland Boulevard and Crescent Drive, the arc light was not burning on the night of the accident, August 19, 1925, and one witness for plaintiff testified that, prior to the accident, he had observed the pole in question and that "it looked like some of them must have struck it—there was a shattered splinter." Defendants' evidence was to the effect that the parkway in question was owned by the defendant city and had been originally acquired by the city for park purposes, and that the pole in question was set in the manner and at the place and distance inside the curb as was usual and customary in setting light or telephone poles along the streets within the city of St. Joseph. Defendants also proffered testimony that the arc light maintained by the city at the intersection of Ashland Boulevard and Crescent Drive was found burning shortly after the accident.

The petition of plaintiff, after stating the topographical conditions existing at the time of his injury and at the place of injury, charges both defendants with negligence in that "said defendants knew, or in the exercise of ordinary care should have known, of such condition and the dangerous and not reasonably safe condition of said pole being located in said street under such conditions and of its abandonment, and that by reason thereof said street at such place was dangerous and not reasonably safe for public travel, in ample time, prior to the 19th day of August, 1925, that the same could and should have been removed or guarded or lighted and rendered said boulevard in a reasonably safe condition for public travel prior to said date." The separate answers of defendants deny generally the averments of the petition and plead that plaintiff was guilty of negligence which directly and proximately contributed to, and occasioned, his alleged injuries.

Appellant assigns error in the giving of the peremptory instruction in the nature of a demurrer to the evidence, thereby forcing plaintiff to take an involuntary nonsuit and to suffer judgment to go against him. Appellant insists that both defendants were guilty of actionable negligence in permitting the parkway, together with the

pole therein, to remain as a dangerous obstruction to vehicular traffic proceeding at night from the north, or wider roadway of Ashland Boulevard, and moving southwardly upon the roadway of said boulevard toward the narrower portion of the roadway of said boulevard, or "gooseneck," and without guarding such obstruction, or providing and maintaining a light, reflector, barrier or other warning sign or device to mark the location and presence of such dangerous obstruction. Respondents, on the other hand, insist that the peremptory instruction was rightly given by the trial court, and that the judgment below is for the right parties, for the reasons, (1) that the evidence clearly and indubitably convicts plaintiff of contributory negligence as a matter of law, and (2) that there is a total failure of proof of any actionable negligence on the part of either defendant. If the latter reason urged by respondents is legally sustainable, then it is unnecessary for us to discuss and rule the question whether the plaintiff-appellant was guilty of contributory negligence, as a matter of law, under all the evidence herein, thereby barring a recovery by him. We will, therefore, first discuss and rule the question whether there is substantial evidence herein of any actionable negligence upon the part of either of the defendants, having in mind, of course, the specific acts of negligence alleged in the petition.

The uncontroverted evidence herein is that, for some twenty-five years prior to the date of plaintiff's alleged injury, there had existed at the place of the accident what is commonly known as a "jog" in Ashland Boulevard; that the improved and traveled vehicular roadway of Ashland Boulevard north of Crescent Drive was thirty-six feet in width from curb to curb, but that the improved and traveled vehicular roadway south of the intersection of Ashland Boulevard and Crescent Drive narrowed to a width of twenty-four feet, or perhaps slightly less, from curb to curb; that, on the westerly side of Ashland Boulevard, between Osage Street and Crescent Drive, there had existed a parkway, within which had been planted trees, grass and other vegetation, which parkway was no part of the improved and traveled vehicular roadway of Ashland Boulevard, but which was separated, designated and marked off from the improved and traveled vehicular roadway by an ordinary stone curb, extending six or eight inches above the surface of the roadway pavement; that, inside said parkway and the enclosing stone curbing thereof, there was a pole which had been erected and maintained by the defendant utility corporation, and which had been used by said defendant for the purpose of carrying its electric lighting circuit wires until approximately three or four months before the date of plaintiff's alleged injury, but which pole was still being used by the defendant city, on the date of plaintiff's alleged injury, for the pur-

pose of carrying several arc street lighting wires owned and maintained by the defendant city; that said pole was erected and maintained in the manner and at the place and distance from the curbing as was usual and customary in placing or setting such poles along the several streets in St. Joseph; that such pole was distant about one foot from, and inside, the east curbing of the parkway, and was distant about three feet from, and inside, the north curbing of the parkway; that it was difficult for the drivers of vehicles to distinguish the parkway and its incidents in approaching the same at night; that, while the defendant city had enacted appropriate ordinances for the widening of the traveled vehicular roadway of Ashland Boulevard at the place where the parkway existed, and for the condemnation and acquisition of said parkway, yet, at the time of plaintiff's alleged injury, the city had not begun the work of widening the vehicular roadway, or removing the parkway, the curbing, the sidewalk, the trees, poles, and the vegetation therein, at the time of plaintiff's alleged injury, nor did the defendant city actually commence the work of removing such parkway, and its incidents, until about eleven days after the alleged accident: Does such evidence (allowing to plaintiff the benefit of every reasonable inference to be drawn therefrom) tend to establish actionable negligence on the part of either defendant herein? If the foregoing question must be juridically answered in the negative, then the trial court acted rightly in giving the peremptory instruction, and the judgment below must be affirmed.

The respondents urge that the establishment, maintenance, and time of removal of the parkway in question is purely a governmental function of the city, and not a ministerial function or duty, the exercise of which governmental function rests within the sound discretion of the municipal authorities, and, therefore, that the defendant municipality is not actionably liable for its failure to exercise such governmental duty or function; that the city has the lawful right to improve and open for public travel, vehicular or pedestrian, only a portion of a dedicated or established street, and when the city, in the exercise of its governmental function, opens and improves for public use only a portion of a street, such city is actionably liable only for its negligence in failing to keep in reasonably safe condition for ordinary public travel and use that portion of the street which it has actually improved and caused to be set aside and thrown open for public use and travel, and is not actionably liable for injuries resulting from defects outside of the improved and traveled portion of the street; that the evidence herein conclusively shows that no injury resulted to plaintiff by reason of any negligence of the city in failing to keep in reasonably safe condition for ordinary public use and travel the improved and traveled

roadway of Ashland Boulevard, and that the collision in question would never have occurred had plaintiff followed the course of the improved roadway of Ashland Avenue and had he not driven his automobile out of the improved and traveled roadway and over the protecting stone curbing which separated and designated the improved and traveled roadway from the parkway; that defendant utility corporation had the lawful right, with the permission of the defendant city, to erect and maintain the pole in question, which was well situated inside the curbing of the parkway and at such distance therefrom as not to imperil or obstruct ordinary vehicular traffic upon the traveled and improved roadway of Ashland Boulevard; that such pole had been placed within the protecting curb and at the usual and ordinary distance therefrom as similar poles were erected and maintained on the several streets throughout the city of St. Joseph, and was so placed for a necessary and utilitarian public service; and that such pole had not been abandoned at the time of the accident, as alleged in the petition, but was then actually being used by the defendant city in carrying its arc street-lighting circuit wires used in the lighting of the streets of the city.

It appears to be well settled by the juristic adjudications in this State that a city has the right to improve and open for public travel only a portion of a platted street, and that a city is not actionably liable for injuries to persons using a portion of the street which the city has not undertaken to improve and to open to public use as a pathway or roadway, although such injuries may be caused by dangerous defects therein. [Ely v. St. Louis, 181 Mo. 723; Marshall v. Kansas City, 297 Mo. 304; Griffin v. City of Chillicothe, 311 Mo. 648.]

In the Griffin case, supra, the defendant city had paved and curbed a strip thirty feet wide in the middle of a platted street, leaving a parkway about thirty feet wide on each side of the paved and curbed roadway. Leading from the paved and traveled portion of the street, and across one of said parkways, was a roadway or driveway onto a lot used as a public hitch yard. A large and deep hole existed in the roadway over said parkway just inside the curb and outside of the paved and traveled portion of the street. Plaintiff drove his team and wagon from the paved portion of the street into the roadway over said parkway, the hole aforesaid having been filled with water from a recent rain, and plaintiff not suspecting that the water covered a deep and dangerous hole, and a front wheel of plaintiff's wagon dropped into the deep chuck hole, throwing plaintiff from the wagon seat and severely injuring him, for which injuries he sought recovery from the defendant city. The negligence charged in plaintiff's petition was that the city had consented to the use of the roadway over the parkway by the public and had negligently permitted a chuck hole to exist within the lines of the platted street

and had negligently failed to guard said hole or to place any warning signs thereabout, although the city knew of the existence of such dangerous hole. In reversing a judgment for plaintiff entered in the trial court, Division Two of this court, speaking through BLAIR, J., said (311 Mo. l. c. 655 *et seq.*) : "The sole question now to be considered is whether the city was required to repair or guard a hole, existing for some time in the driveway over the parking, within the limits of the street as originally laid out, improved and used for a number of years, but outside of the paved portion of the street and its curbing, which designated the place for, and confined the limits of ordinary vehicular travel over the street. . . . It is clear that, if plaintiff had continued driving upon the paved portion of the street and had not attempted to drive his team and wagon across the parkway into the hitch yard, he would not have been injured by the presence of the chuck hole. . . . The right of a city to improve and open for public travel only a portion of the platted and accepted street and its freedom from liability for injuries to persons using a portion of the street, which the city has not undertaken to improve and to open to public use as a street, although such injuries may be caused by dangerous defects therein, are fully established in this State. [Ely v. St. Louis, 181 Mo. 723; Marshall v. Kansas City, 297 Mo. 304.] . . . By paving and curbing a strip only thirty feet wide, the city plainly designated the portion of the street it intended to be used for vehicular travel and openly and effectually notified all persons using the paved portion of the street that such portion of the street was all it undertook to keep in repair. . . . We think the trial court erred in refusing to instruct the jury that plaintiff was not entitled to recover under the evidence in the case."

In Fockler v. Kansas City, 94 Mo. App. 464, 468, it is said: "It will be readily conceded that the city, for obvious reasons, had the right to leave a space between the curbing of the street and the sidewalk unimproved. In other words, it was not compelled to put the entire space occupied by the street in the same uniform condition for travel. . . . It is agreed that trees and other obstacles are usually found in such spaces, and certain authorities are cited to the effect that a city is not liable for injuries occasioned by such obstructions. [See Weinstein v. Terre Haute, 147 Ind. 556; Macomber v. Taunton, 100 Mass. 225; Wellington v. Gregson, 31 Kan. 99; Clark v. Dasso, 34 Mich. 86; Everett v. Council Bluffs, 46 Iowa, 66.] These authorities embrace a sound principle of law, and are entitled to our approval. . . . Every one must take notice that trees for ornamentation, comfort and health, and other useful things, are placed in such spaces, and he who travels therein must expect to encounter them, and he is not entitled to compensation for damages

if he is injured thereby. . . . Such things, by reason of their usefulness and ornamentation, become a necessity and are to be treated as much a part of the city as the houses and streets themselves."

In Platt v. City of New York, 28 N. Y. Supp. 672, 674, the city had constructed a wire fence, about three and a half feet high, separating a bridle path from a footpath in a public park. After dark on an evening, plaintiff, who was riding horse-back, entered the park and mistook the footpath for the bridle path, and was severely injured when his horse collided with, and fell upon, the wire fence between the two paths. In addition to the fence, there was also a gutter and a curb, plainly separating the bridle path from the footpath. In ruling that there was no actionable liability upon the part of the defendant city, and, therefore, that plaintiff was not entitled to recover for his injuries, the Superior Court of New York said: "The case at bar is therefore analogous to the cases where people have been injured by driving against water hydrants, trees, hitching posts, telegraph poles, awning posts, or stepping-stones situated on the sidewalk immediately adjoining the driveway. In this class of cases, it has been invariably held that there was no liability on the part of the municipality. [Ring v. City of Cohoes, 77 N. Y. 83; Dubois v. City of Kingston, 102 N. Y. 219; Macomber v. Taunton, 100 Mass. 255; Cushing v. Boston, 128 Mass. 330; Arey v. City of Newton, 148 Mass. 598; City of Wellington v. Gregson, 31 Kan. 99.] It is a familiar rule that the question as to how much of a street shall be set aside for the driveway, and how much for the sidewalk, trees, gutter, etc., is, in the absence of a controlling statutory provision, matter of municipal discretion; and I cannot find that any one has ever questioned the right of a municipality to separate its walks and drives by fences. The exercise of this discretion is in the nature of a judicial act; and for this reason it is firmly established that a municipal corporation is exempt from all liability for the manner in which its officers, in good faith, and within the scope of their respective powers, exercise such discretion. [Citing authorities.]"

In Wolf v. District of Columbia, 21 D. C. Appeal Cases, 464, 470, plaintiff, who was injured in falling in the dark over a carriage block placed in a parkway between a roadway and sidewalk, and who sought recovery therefor from the District of Columbia, invoked a statute which made it the duty of the chief of engineers of the District to cause obstructions to be removed from streets and sidewalks in the city of Washington. Said the Court of Appeals of the District of Columbia: "It is clear, the provisions of the statute do not apply to many things that may, in a sense, be regarded as obstructions to the sidewalks of a city. They certainly do not apply to the shade

trees growing along the sidewalks, nor to lamp posts, water hydrants, awning posts, telegraph or telephone poles, that we find everywhere in the city, along the sidewalks. All these things may be regarded, in a particular sense, as obstructions, but they are not such within the meaning of the statute. They are objects allowed and authorized, by immemorial custom and usage, as being necessary to the health, convenience, protection, and enjoyment of the homes and lives of the inhabitants of the city. . . . But the plaintiff contends that even conceding that the carriage block in question was not an unlawful obstruction, and did not constitute a public nuisance, yet the street in that particular section was defectively and insufficiently lighted, and because of such defective and insufficient lighting of the street and sidewalk, the plaintiff ran against and stumbled over the block or stepping-stone and was injured, and that the defendant corporation is liable for such injury, because of the neglect to properly light and keep lighted the street and sidewalk where the accident occurred. But whatever insufficiency may have existed in the light upon the occasion of the accident (if any insufficiency did in fact exist), such an action as the present is not the remedy for the consequences of such defect. . . . These are matters that are confided exclusively to the judgment and discretion of the municipal authorities.''

In affirming the judgment in the case last cited, the Supreme Court of the United States, speaking through Mr. Justice MCKENNA, said (196 U. S. 152, 157): ''The second contention of plaintiff in error is that it was the duty of the District of Columbia to so light the street as to show the presence of the stone thereon, the District having full knowledge thereof. . . . The duty of a city to especially illuminate a place where an object is, or to put a policeman on guard by it to warn pedestrians, depends upon the object being an unlawful obstruction. The plaintiff in error can claim nothing from the general duty of the city under the statute to light the streets. The exercise of such duty was necessarily a matter of judgment and discretion, depending upon considerations which this record does not exhibit.''

In Horner v. City of Philadelphia, 194 Pa. St. 542, 543, wherein plaintiff was denied a recovery for injuries suffered in falling over a fire plug placed on a public sidewalk, that court said: ''There was no evidence showing that the fire plug was placed in an unusual position or was of defective structure such as to induce the accident for which this action was brought. It was placed within four inches of the curb, and was of the ordinary diameter. As fire plugs are a clear public necessity, and cannot be placed in the open highway, and as they must be placed in such a position as to be easily ac-

cessible in case of fire, there is no other position for them but on the sidewalks, and it is the universal practice to locate them there. The municipality is the sole authority to determine this matter, and, of course, as we have frequently held, their discretion is not to be held subject to the verdicts of juries. The city is under no legal obligation to light its streets, and cannot be held responsible for an alleged insufficiency of light.''

In City of Fairbury v. Barnes, 228 Ill. App. 389, 395, the general and applicable rule of law is thus announced: "In general, the local corporation (city) has discretionary power to establish and open streets and public ways, fix their width, determine how much of that width shall be devoted to carriage way and how much to foot way or sidewalk, direct the planting of trees within the limits of streets and public grounds, decide where and how hitching posts shall be set, telegraph, telephone and electric wires and poles erected, and to make all necessary and desirable regulations which are reasonable and manifestly in the interest of public safety and convenience. [3 McQuillin on Mun. Corp., sec. 925.]''

The case of Gulfport Traction Co. v. Manuel, 123 Miss. 266, 276, 85 So. 308, is, perhaps, more nearly like the present case in its substantive facts than any we have found. In that case, plaintiffs' intestate was killed as a result of the collision of a motorcycle, which he was driving, with a guy-wire post maintained by the traction company to support an electric trolley wire along and within a public street, but outside of the improved and traveled roadway, in the city of Biloxi. Recovery was sought for the death of plaintiffs' intestate against both the city and the traction company, upon the theory that the pole was negligently erected and maintained in a public street and constituted a dangerous obstruction therein. Plaintiffs recovered a judgment in the trial court, and, in reversing the judgment outright, the Supreme Court of Mississippi, en banc, said: "The appellees sued the city of Biloxi and the Gulfport & Mississippi Coast Traction Company for damages occasioned by the death of William Manuel, the husband of the plaintiff, Eugenia Manuel, and the father of the other plaintiff. William Manuel's death was caused by a violent collision with a post situated within the right of way of a street of the city of Biloxi, which post was used as a guy-wire post to support the trolley wire of the Traction Company which operated an electric street car line along the said street. The pole which caused the death of Manuel was situated outside of the traveled portion of the street, but some fourteen feet from the property line on the south side of the street. The street from property line to property line was about thirty-seven feet. Near the center of the street was a shell road seventeen and seven-tenths

feet wide, which was the traveled road for vehicles. The electric car line lay between the shell road and the north property line of the street, and the record shows that the street was on a level with the tracks, and the grass was short along the railroad tracks. . . . Within this space the traction company was directed by the city to place its guy poles, and they were placed in accordance with the direction of the city and had been in the street at the point where located for twelve or fifteen years prior to the injury. . . . It is insisted by the plaintiffs that it was negligence for the city and the traction company to erect within the limits of the street the poles in question; that the street must be kept in a reasonably safe condition for travel. While the street must be used for public purposes, it is not necessary for the entire space to be kept in condition for travel. The city may lawfully use the street for the construction of sewers, for drainage, to lay gas or water pipes, or to erect poles or string wires for electric lights, . . . or set apart for a boulevard a portion of a street not devoted to business purposes. [28 Cyc. 853.] It is permissible for the city to set apart a portion of the street for the erection of poles to support light, telephone, and trolley wires. The electric street car system is a convenience and necessity which serves the public interest, and it is not negligence to erect poles between the sidewalk and the traveled parts of the street. The traveled part of the street was practically eighteen feet wide and is sufficient for the travel according to the record before us. The pole in question was located some three and one-half feet beyond the edges of the traveled way as ordinarily used by the traveling public. The extent of the obligation of the city in working its streets is to keep them reasonably safe for general use. It is not required to have them in such condition as to insure the safety of reckless drivers. [Citing cases.] A user of vehicles is not entitled to the entire street from property line to property line. The street not only serves the needs of the traveling public, but serves also the purpose of furnishing the public the conveniences above set out. . . . The pole was situated outside of the traveled way, and it was not negligence to permit the pole to be erected as it was in this case. We think the record fails to show liability against the appellants, and the judgment of the court below will be reversed, and judgment entered here for the appellants.''

The appellant herein has cited a number of authorities which he contends rule the actionable liability of both defendants. We have given careful consideration and analysis to all of such cases, and we are convinced that they are not in point on their facts, regardless of the principles of law announced therein. The greater number of such cases are cases wherein a dangerous obstruction, excavation, or

other defect had been permitted to exist so close to the traveled portion of the street or sidewalk as to endanger users thereof, while using the same in the ordinary manner and for the purpose for which such roadway or sidewalk was intended and improved. Other cases cited by appellant involve facts wherein a dangerous obstruction or excavation was permitted to remain within that portion of a street or sidewalk which had been thrown open and improved for public use and travel, and within the traveled way itself. Perhaps, however, some mention should be made herein of the case of Lambert v. Electric Railroad Co., 191 N. Y. 248, 253, cited by appellant, wherein a city fireman was injured by collision with a trolley pole, maintained by defendant street railroad company within less than a foot from the edge of a driveway leading from a fire station onto the traveled roadway of a public street, while plaintiff was climbing onto the step of the fire wagon, in going to a fire, and as the fire wagon was rapidly turning from the driveway of the fire station into the traveled roadway of the street. The court, in ruling that case, clearly announces the reason and legal ground for its ruling therein, as distinguished from ordinary cases, as follows: "If a person were injured by a collision with the pole by a wagon which was being driven under circumstances which permitted deliberation and accuracy of movement, it very well might be said that the accident was not one which reasonably should be apprehended. But that is not this case. A piece of fire apparatus going to a fire is not only permitted, but expected, to go rapidly, and especially as the horses first come out of the barn it should be anticipated that they would not be under perfect control or in a regular gait, or that in making a right angle turn from the driveway into the street towards the pole, as was being done on this occasion, mathematical accuracy could be observed in keeping the apparatus in the center of the driveway."

We are of opinion that neither of the defendants herein is chargeable with actionable negligence in the maintenance of the parkway, or its incidents, including the pole in question, which were entirely and wholly outside of the traveled and improved roadway of Ashland Boulevard set aside and designated by the defendant city for ordinary vehicular travel and use of the public. The evidence herein does not tend to show, in any sense, that the twenty-four foot improved and curbed roadway of Ashland Boulevard on the east side of the parkway, and which had been, and was at the time of plaintiff's injury, by reason of its improvement, set aside and designated by the city for ordinary vehicular use and travel, was inadequate to accommodate such public traffic. The improved and traveled roadway was situate in a residential district, and there is no evidence herein that plaintiff was impeded, confused, or interfered with, in the ordinary use of said traveled roadway, by any congestion of traf-

fic thereon, or by any automobile or other vehicle then using the twenty-four foot improved roadway. It is palpable and plain that, had not plaintiff driven his automobile off the traveled and improved roadway, and over the six or eight inch protecting curb which marked and designated its boundary, his automobile never would have collided with the pole within the parkway. The pole, according to the evidence, was not erected and maintained so close to the traveled and improved vehicular roadway as to endanger any one using such traveled and improved portion of the street in the ordinary manner and for the purpose for which such roadway was intended and improved. According to plaintiff's testimony, his automobile traveled about three feet after "jumping" the stone curbing before it collided with the pole. In no proper or legal sense can we say that the pole was a dangerous or unlawful obstruction to ordinary vehicular traffic in the traveled and improved roadway. It was not negligence on the part of the defendant city to improve and open for vehicular traffic only a portion of Ashland Boulevard. The city was not required, as shown by the authorities above cited, in the exercise of its governmental function and discretion, to remove the parkway and to widen t s roadway for vehicular travel, and is not actionably liable for its failure so to do. Neither do we think that defendant city is chargeable with actionable negligence in failing to maintain a barrier, warning sign, or reflector on the parkway in question. In almost every city of size in the State, some streets and traveled roadways are laid out and improved without uniformity as to width of roadway or direction; that is to say, "jogs," "goose-necks," and cul-de-sacs are of more or less frequent existence in all of the cities of the State, especially in residential districts; and to judicially say that, at every such place, a municipality must maintain some barrier or warning device is more than we think the law requires. Even though the defendant city had maintained on the parkway in question a barrier or warning sign, it does not appear that the collision might have been averted thereby, for it is inconceivable to our minds how any more effectual warning or barrier could have been provided than the parkway itself, with its growth of trees, vegetation, and other incidents thereon, together with its surrounding and enclosing curb. Furthermore, the petition herein does not charge defendants with negligence in not maintaining or providing a reflector upon the parkway, but charges only that the place of the accident was not lighted. Even though the city be deemed to be actionably liable and negligent in failing to light the place in question (a question which we think it unnecessary to decide and rule herein), nevertheless, plaintiff's evidence shows that the defendant city did, in fact, maintain at the time of his alleged injury an arc street light at the intersection of Ashland Boulevard and Crescent Drive, immediately in front of the

parkway as a driver of an automobile approached the parkway from the north. True, plaintiff testified that the right was not burning at the time of the accident, while defendants witnesses, on the other hand, say that the arc light was found burning very shortly after the accident. Regardless of such conflict in the evidence, however, and assuming that plaintiff is correct in saying that the arc light was not burning at the very time of the accident, nevertheless, plaintiff's evidence is not sufficient to establish that the light was extinguished for such a length of time before the accident as to have afforded reasonable notice to the defendant city thereof, and to have allowed the city reasonable time to remedy the defect or insufficiency in the light. [Fehlhauer v. St. Louis, 178 Mo. 635; Miller v. Kansas City, 157 Mo. App. 533.]

Neither do we think that defendant utility corporation is chargeable with actionable negligence in erecting and maintaining the pole upon the parkway in question. Such pole was erected and maintained with the permission and acquiescence of the city for a necessary public use and service, and was being so used by defendant city, according to the uncontradicted evidence, at the time of the accident, and the evidence also shows that such pole was erected and maintained in the manner and at the place and distance from the curb that similar poles were erected and maintained along the several streets throughout the city of St. Joseph.

Having reached the conclusion that neither defendant is shown by the evidence to have been guilty of actionable negligence with respect to the matters charged and averred in the petition, it becomes unnecessary for us to discuss and rule the question of plaintiff's contributory negligence as a matter of law.

It therefore follows that the trial court committed no reversible error in peremptorily instructing the jury to return a verdict for both defendants, and in refusing plaintiff's motion to set aside the involuntary nonsuit taken. The judgment *nisi* must be affirmed, and it is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.