SOPHIA CARRUTHERS v. CITY OF ST. LOUIS, a Municipal Corporation, Appellant, WEBB-BOONE PAVING COMPANY, a Corporation, Defendant.—111 S. W. (2d) 32.

Division One, December 14, 1937.*

---

*NOTE: Opinion filed at May Term, 1937, July 30, 1937; motion for rehearing filed; motion overruled at September Term, December 14, 1937.

*Edgar H. Wayman* and *Louis A. McKeown* for appellant.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for respondent.

HYDE, C.—This case, recently reassigned to the writer, is an action for damages for personal injuries. Plaintiff had a verdict for $13,000 against defendant city. Plaintiff took an involuntary nonsuit as to the other defendant, but has not appealed from the judgment of dismissal. Defendant city has appealed from the judgment entered on the verdict.

The city assigns as error the overruling of its demurrer to the evidence at the close of the case. Plaintiff was injured when an automobile, in which she was riding with her husband driving, ran over the curb of a parkway in the center of the street and struck a steam shovel therein. The negligence charged and submitted against the city was negligent construction and maintenance of the paved portion of the street by making and leaving a black line in the center thereof which led directly to and ended at the curb in front of the parkway; and also failure to place barriers, lights, reflectors or

other warning devices to mark the parkway curb or to mark the location of the steam shovel therein.

The place of the accident was on Watson Road, a street opened by the city in 1917, running southwest to the city limits, originally with a forty-foot right of way which was later widened to eighty feet. In 1926, a pavement seventeen and one-half feet wide and was laid along the west side. In 1929, a pavement of equal width was begun on the east side, leaving a twenty-foot parkway between the two paved portions. A curb six or eight inches high was built around the parkway. Outside the city limits, in 1929, Watson Road remained "a rather narrow lane—a 40-foot right of way." Cinders had been put on a small section of it. When Watson Road was widened inside the city, the plan was for it "to form a major thoroughfare of the city eventually." The paving on the east side was completed in August, 1931, and at that time the State Highway Department had commenced to construct U. S. Highway 66 to connect with it. The State highway was opened in May, 1932. It was forty feet wide with four lanes for travel marked by painted black lines. Watson Road including the parkway and the two paved roadways was fifty-five feet wide. From the connection at the city limits, "Watson Road widens 7½ feet in a distance of 102 feet from Route 66 (on each side). A car would, if following on a parallel line with the south (or east) line of 66, only have to turn 7½ feet in 102 feet to conform to the new line of Watson Road. The parkway is 86½ feet from the city limits at the center of the road. It is 525 feet from the crest of the hill (outside the city) to the curb at the parking strip. The grade is about 4½ per cent." There were street lights on standards placed alternately along each side of Watson Road inside the city. One of these was between the end of the parkway and the city limits.

The city's pavement between the parkway and the city limits was laid in sections and the space between these sections was filled with tar. Some of these tar lines ran across the pavement at right angles to the direction of travel. From the end of the parkway, where these concrete slabs joined, the center line was filled with tar, and this line served the purpose of separating the traffic going east and west and also prevented the highway from deteriorating. On each side of this center line, there were two painted lines which designated the line of travel for the two paved roadways, so that each had two lanes for traffic traveling in the same direction. The tarred center line continued from the city limits to the center of the end of the parkway (eighty-six feet). The painted line for eastbound traffic, beginning at the city limits, deviated to the right and led the traffic into the lanes in the paved roadways on each side of the parkway and continued down the center of the seventeen and one-half foot slab.

Shortly before this accident, the State Highway Department, with permission of the city, commenced a project which included the widening of a bridge at the foot of the hill, east of the scene of the accident, and the paving of its whole width, including the parkway. A contract was let by the State to defendant Webb-Boone to remove the parkway and to pave the whole width of Watson Road within the city limits. A permit for this work was given to the State by the Board of Public Service of the city, dated July 15, 1932. Several days prior to the accident Webb-Boone, preparatory to starting its excavation work, moved its steam shovel into the parkway and placed it at a point about ten feet from the western curb line of the parkway and within about five feet of the north and south curbs. The actual grading work had not been commenced on August 28, 1932, and no part of the steam shovel extended closer than seven or eight feet to the end of the parkway.

Plaintiff's evidence as to the occurrence was that about seven-forty-five P. M. on that day, which was Sunday, she was riding in an automobile which her husband was driving toward St. Louis on U. S. Highway 66 closely following another car. Plaintiff's car was traveling on the inside eastbound lane. The car lights had been turned on. Traffic was heavy and there was a line of cars in the outside eastbound lane. Plaintiff said she suddenly noticed the car ahead turning toward the outer lane, and saw an object ahead. She called to her husband, " 'Look!' and he said, 'Sit still, I see it.' " She remembered nothing more until after she reached the hospital. Plaintiff's husband's account was that he had never been over that portion of the highway before; that it was very dark; that his brakes were in good condition; that he had turned on his lights; that he was not able to get into the outside lane because of heavy traffic; that he followed the same car all the way in; that just before he got to the city limits he "was traveling about 20 to 25 miles per hour;" and that this was about the same speed he "had been going all the time." He further said: "As we came over the crest of the hill I was following another car and we were driving at a uniform speed with very little change, when suddenly, without any apparent reason, this man turned quickly to his right and he passed from my view between me and an object. I saw a curb just immediately in front of me. In my opinion I was about—not over eight to ten feet from that curb when I first observed it. I applied my brakes and I went over the curb. Then I struck the steam shovel. . . . I only saw one automobile in front of me after I left the Laclede Station road in that particular lane. There was a continuous string of cars to my right. After I left the Laclede Station road I was about twenty or twenty-five feet back of this other car and I continued that distance all the way in. . . . I saw the center black line. That is

what I was following. It was the only line I saw. It was right in front of my headlight. I couldn't see the black line to the right. I wasn't looking for it. I may have seen it, but I made no mental note of it. . . . I was ten feet from the curb when I heard my wife say 'Look!' She and I saw it simultaneously. I don't know how far I was from the curb when I said, 'Sit still, I see it.' At that time I hadn't seen anything beyond the curb. I could see an eight-inch curb. My lights were good on the night of August 28th. I could see a distance of 140 feet with my lights. . . . The man's car in front of me was approximately fifteen feet from bumper to bumper and I was twenty-five feet back of him. At the beginning of the turn his car was ten feet away from the curb. . . . Based on my general experience as a driver, that under the conditions as they were that evening, I could stop my car going at a speed of twenty miles an hour in twenty-five feet. I testified at thirty miles I could stop within thirty-five feet. . . . I was slackening my speed when I approached the curb.'' Plaintiff's husband was completely blind in his left eye but said that his right eye was normal with glasses and that he was a good rifle shot. He had previously been in two other automobile accidents. In one of them a vertebra in his neck was broken so that he ''suffered spasmodic paralysis as a result.'' He said that after this injury at times when ''in the nature of a cramped position, this hand will turn like ice;'' and that he was also ''subject to dizzy spells . . . everything goes dark.'' However, he said that, while he had that condition in 1931, it had entirely cleared up and that he ''was in perfect condition when (he) ran into this steam shovel.''

Plaintiff's evidence also showed that the atmosphere was ''kind of smoky and hazy;'' that there was a striped board and reflector at the front of the parkway (put up by the State Highway Department) which was being frequently knocked down by automobiles (plaintiff's own evidence was conflicting as to whether this board was up before plaintiff's approach); that lanterns on the steam shovel were not lighted; that there was a ''Slow'' sign on the highway over three hundred feet west of the parkway; that there was a ''Road Narrows'' sign about twenty feet east of the ''Slow'' sign; and that there was also a ''Road Under Construction'' sign near the crest of the hill about five hundred feet from the parkway; that these signs were about two feet by two and a half feet in size; and were located on the south side of the highway about eight feet from the edge of the pavement. The man, who was driving the car ahead of plaintiff, testified: ''I was watching along there because I knew there was a parkway in the center of the road some place. Just as I got up there about fifteen foot I seen this coping—parkway, looming up to my right just at the bottom of this coping. I swerved to

the right as quick as I could and gave the man behind me a chance to get in there too. I went clean on the other side of the right of the highway, but off the concrete on the clay. . . . I was leading the procession as I came to the top of this hill, going probably twenty-five miles an hour. I turned on my side lights—my dimmers. There were cars back of me, to the right, but not alongside of me. . . . The beam of my light throws around fifteen or twenty feet in front of me.'' There was conflicting evidence as to whether the street lights were burning, as to whether there were lights on the steam shovel, and as to how dark it was.

· Defendants' evidence tended to show that the accident occurred earlier than seven-forty-five P. M., and when visibility was good, and that plaintiff's car knocked down the striped board and reflector. It also showed that sunset on August 28, 1932, was at six-thirty-eight P. M.; that twilight ended at eight-ten P. M.; and that at seven P. M. the sky was clear according to weather bureau records.

■ It seems apparent that plaintiff's husband, on plaintiff's evidence, was negligent, but the negligence of a driver cannot be imputed to a guest. [Schmitt v. Missouri Pacific Railroad Co. (Mo.), 102 S. W. (2d) 658, and cases cited.] ■ Plaintiff does not claim that there is an absolute duty to mark boundaries of traveled portions of streets with lights or warning signs, and there is no common-law duty to provide street lights. [13 R. C. L. 432, sec. 354; L. R. A. 1915A, note; it is even held that there is no duty to light a lawful structure (large enough to be seen) erected in the street. Lorentz v. Public Service Ry. Co. (N. J.), 134 Atl. 818, 49 A. L. R. 989, and note.] Nor can plaintiff make a case on either original negligent construction, or on failure to rebuild or widen for increased traffic.

■ A city has the right to designate what part of a street should be paved and traveled, and to build the traveled part of the street around a parkway; and it is not liable for injuries sustained by persons who travel outside of the designated portions. [Clinkenbeard v. City of St. Joseph, 321 Mo. 71, 90, 10 S. W. (2d) 54; Griffin v. Chillicothe, 311 Mo. 648, 279 S. W. 84, 42 A. L. R. 1273.] The kind of construction adopted here eliminates head-on collisions, and reduces danger from glare of approaching headlights. It may be safer than any other, especially when the safety of pedestrians crossing the street is also considered. The question of type of construction was for the city to decide, without liability for not making the best choice if what it built was not inherently dangerous. Moreover, there is no evidence of accidents at this place or to show any dangerous condition until the State highway was connected with it; and when the connection was with a narrow unpaved county road, it is not claimed that even the black tar line in the center made this part of the street unsafe and dangerous. ''The city was not required (even

when the State highway caused an increase in traffic) . . . in the exercise of its governmental function and discretion, to remove the parkway and to widen the roadway for vehicular travel, and it is not actionably liable for its failure so to do." [Clinkenbeard v. St. Joseph, supra.]

Plaintiff's position, however, is that the black tar line in the center of the pavement from the city limits to the end of the parkway (eighty-six feet) made this part of the street unsafe and dangerous. Plaintiff says this black line created a misleading situation because it operated as an invitation or designation to motorists to continue to drive along it to the parkway; and that, in order to make this part of the pavement reasonably safe, there should have been markings on the pavement on or near this black center line indicating that traffic must turn to the right before reaching the parkway; or there should have been lights, reflectors, or other warning devices to show the boundary of the parkway. Plaintiff's theory, therefore, seems to be negligent maintenance of an unsafe condition of the pavement because of leaving such a black line therein. Plaintiff relies upon Boyd v. Kansas City, 291 Mo. 622, 237 S. W. 1001, and similar authorities stating the rule that a city is exercising its ministerial or corporate powers in making improvements in streets, and has the duty to construct and maintain them in such condition that they will be reasonably safe for public travel, and, therefore, is liable in damages for injuries caused by negligent construction or by failure to keep them "free from nuisances, defects and obstructions caused by itself or by third parties if it . . . had actual or constructive notice thereof in time to abate the nuisance, remove the obstruction or repair the defect." There can be no question about these well established rules or that the duties imposed by them are nondelegable duties.

The Boyd case is very different from this one on the facts. There a bridge was built with a real obstruction (a girder twenty inches wide and thirty-two inches high at each end and rising gradually several feet higher toward the center) in the middle of the part of the bridge provided for public travel. The Boyd case was submitted on the theory of negligent maintenance, of an obstruction to travel on the bridge at night, without lights to mark its location. There is certainly a great difference, even if only visibility be considered, between a girder twenty inches wide and a parkway twenty feet wide. A still greater difference, so far as liability is concerned, is that in the Boyd case it was held that such an unlighted obstruction at such place was negligent maintenance of an actual obstruction in a place designated for the public to travel; while here there was no obstruction or defect whatever on the part of the street designated for public travel. Nor are cases in point, like State ex rel. Springfield

v. Cox, 327 Mo. 152, 36 S. W. (2d) 102, or Williams v. City of
Mexico (Mo. App.), 34 S. W. (2d) 992, where there was nothing to
mark any limits between traveled portions of the street and a real
obstruction. Here the claim is not that anything was maintained
which could injure anyone traveling on the part of the street desig-
nated for travel, but that the black line misled those traveling toward
the city as to where the boundaries for travel were; and that since
these boundaries were not marked by lights or warning signals,
persons using the street would run off of the traveled part because
they would follow the black line. In this case there was no defect in
nor obstruction on the pavement, which in any way interfered with
traffic. It is ordinary, usual and proper to lay concrete pavement in
sections to provide for expansion and contraction from heat and cold,
and to fill the spaces between sections with tar to prevent deteriora-
tion. This is not a defect but is to prevent it from becoming defec-
tive. It is certainly not an obstruction. There were other similar
black lines of tar running across the street, at right angles to the
direction of traffic and it is not claimed that they interfered with
traffic.

It seems clear that to make a case, on the theory that the black
line misled and misdirected drivers as to the proper direction of
travel, the real basis thereof must be either a failure by the city to
perform the duty of directing traffic, or an improper negligent per-
formance of that duty. What created the condition that it is
claimed made this part of the city street not reasonably safe? Un-
doubtedly, this condition was created by the State building its wider
highway and painting its black center line thereon up to a place
where it connected with the tar line in the center of the city street
so as to give the appearance of being carried on by it. What was
the purpose of the State's black line? It was painted wider and
extended beyond the tar. It clearly was a line for the purpose of
directing traffic, although the evident purpose was to indicate the
lateral limits within which traffic should move rather than to be
blindly followed for direction. The State recognized that, after
what it had done, it was necessary to give warning that its four travel
lanes did not continue without change of width or direction inside
the city limits; and it put up warning signs. Plaintiff says that
the city should have done something to change this situation and
suggests painting lines on the city pavement to lead around the park-
way. Why? Since it was not an obstruction in the street, would
not such lines be only for the purpose of directing traffic around it?
Plaintiff says that the tar line was a designation to motorists to con-
tinue in the direction and as far as it went. If that is true would it
not merely be an improper direction of traffic? It is also true that
plaintiff says that there should have been lights or warning signs on

the parkway, but what plaintiff's contentions about lights and warning signs amount to is that the city should have put them up because it failed to properly direct traffic, otherwise, by leaving only the tar line which indicated a wrong direction at this place.

Direction of traffic is a governmental function, and, therefore, a city cannot be held liable in damages for negligence in regulating or failing to regulate traffic. [Prewitt v. City of St. Joseph, 334 Mo. 1228, 70 S. W. (2d) 916; Auslander v. City of St. Louis, 332 Mo. 145, 56 S. W. (2d) 778.] This case is squarely within the principles announced in the Auslander case when considered upon the theory most favorable to plaintiff, namely, that the black line amounted to a misleading and negligent direction to traffic. In the Auslander case, an automatic stop and go signal was permitted to remain out of order so that one side directed traffic to go when the other side did not warn intersecting traffic to stop. The claim there was that the injured plaintiff's husband, who was driving an automobile toward the side of the sign that was not working, was misled, by its failure to work on his side, into believing that it was turned off and would not direct traffic from the other side to go while he was crossing the intersection. It was there charged (and this court so held) that the failure to turn off the sign or put up some warning sign that it was out of order was negligence, but that this was negligence in the performance of a governmental function for which the city was not liable.

This court, en banc, said in the Auslander case, that "plaintiff's complaint is not that the collision was caused by this signal itself, but only that such collision could and would have been averted had the defendant kept the signal light working;" that "there is a difference . . . between the physical condition of a street and its use by the public;" that "the manner in which a highway of a city is used is a different thing from its quality and condition as a street;" and that "a holding that a municipality is liable on account of an unsafe condition of the streets, where such unsafety is due to no physical imperfection, would involve the modification of well-established principles of law." We hold that the situation here is the same. Plaintiff's complaint here is not that the collision with the steam shovel in the parkway was caused by the black line itself; but only that such collision could and would have been averted had there been no black line or if some definite indication that it should not be followed had been given by other lines, lights or reflectors which would show that the black tar line ended at the parkway, and which would direct traffic away from the direction apparently designated by the tar line. It was, therefore, the manner in which plaintiff's husband considered that he was directed to use the street by the black line that caused him to run off of it and not the physical con-

dition of the street. The unsafe condition claimed was due to no physical imperfection in the pavement that caused him to leave it, but this was due to a misleading mark, or his misinterpretation of such mark, as to the direction traffic might move thereon. We, therefore, hold that the city is not liable for any effect of the black line as a negligent or misleading direction to traffic.

The judgment is reversed. *Ferguson* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.