ANNABELLE BLACKBURN v. CITY OF ST. LOUIS, Appellant, and GEORGE ROGUL, Defendant.—121 S. W. (2d) 727.

Division One, November 19, 1938.

*E. H. Wayman* and *Louis A. McKeown* for appellant.

*Eagleton, Waechter, Yost, Elam & Clark* and *Frank E. Atwood* for respondent.

304

HYDE, C.—This is an action for damages for personal injuries. Plaintiff had a verdict for $58,000 against both defendants. The trial court ordered a *remittitur* of $28,000 which was made. Judgment was entered for plaintiff for $30,000 and only the city has appealed therefrom.

Plaintiff was struck and injured by an automobile (east-bound) driven by defendant Rogul while she was standing on the sidewalk (about 7:00 P. M.; in February, 1934) waiting for an east-bound street car, near the southwest corner of the intersection of Easton and Euclid avenues in St. Louis. The direction of Easton Avenue is east and west. Its pavement (brick) was 50 feet wide, with two street car tracks in the center, and its south sidewalk was 15 feet wide. Plaintiff was standing at the back (south) side of the sidewalk next to the wall of a building. The surface of the sidewalk was about eight inches higher than the surface of the roadway. There was a reflector type stop sign in the southwest corner of the intersection, for the purpose of requiring east-bound traffic on Easton Avenue to stop before entering Euclid Avenue. This sign was placed near the sidewalk curb and was a short distance east of the place where plaintiff was injured. There was one 400 candle power light at the southwest corner of the intersection; another at the northeast corner and a third 120 feet west thereof on the north side of the street.

South of the south street car track in Easton Avenue, and west of Euclid Avenue, the appellant city had constructed a safety zone, by fastening to the surface of the pavement six convex metal markers, known as "traffic buttons," and marking the limits of the safety zone by a yellow line painted on the surface of the pavement between the outer (nearest the sidewalk) or southernmost, of these "traffic buttons." The "traffic button" fartherest west was located with its northern edge fifteen inches south of the south rail of the street car track and eighty-six feet west of the intersection of Easton and Euclid Avenues. Nineteen feet east of this westernmost button, there were three more buttons, extending in a row from north to south at right angles to the yellow line. The north edge of the northernmost button in this row was twenty-eight inches south of the south rail of the street car track and the other two buttons were immediately adjacent thereto to the south with their edges in contact. The center of the southernmost button in the row was five feet two inches

south of the south rail of the street car track. The remaining two buttons of the safety zone were located with their centers five feet two inches south of the south rail of the street car track and were respectively, twenty-seven and fifty-four feet east of the row of three buttons. This type of button had been in use in St. Louis since 1926. The yellow line painted on the pavement of the roadway, joining the buttons nearest the sidewalk designated the south side of the safety zone, which was five feet two inches wide until it reached a point approximately 67 feet west of the intersection. The yellow line then ran diagonally toward the car track where the westernmost button was placed near the track. These "traffic buttons" were ellipsoidal metal objects with a round, flat base thirteen inches in diameter, their upper surfaces being corrugated and about four inches high in the center. Each of these "buttons" had a circular opening on one side in which there was an optical device, referred to as the "frog eye," consisting of an arrangement of lenses and mirrors designed to reflect back to the driver of an approaching vehicle the beams from his headlights, and thereby serve as a warning signal to the drivers, of vehicles approaching at night, of the presence and location of these buttons. There was about 12 feet of paved roadway between the yellow line and the sidewalk curb.

These buttons were placed in the street to make the safety zone under authority of the city's Ordinance No. 38779 (enacted in 1930) which provided:

"Section One. . . . Safety zones as herein defined, described and provided for are hereby declared necessary for the safety of pedestrians, and are hereby authorized, with the same degree of intention as if individually designated, at every intersection within the corporate limits of the City of St. Louis, of two or more public highways at which a street railway track, or tracks, are maintained.

"Section Three. The Director of Streets and Sewers is hereby directed and ordered to lay out, place, construct or erect, and maintain, or cause to be laid out, placed, constructed or erected and maintained, safety zones at all of the public highway intersections. . . .

"Section Six. Safety zones, as herein authorized, shall be of the following general types: . . .

"(F) A portion of the surface of the roadway set apart by convex metal markers fastened to the roadway, which said markers shall not exceed eighteen inches in diameter and six inches in height above the roadway. Said markers may be equipped with devices for reflecting illumination; and the portion of the roadway to set apart may be further bounded by yellow stripes or markings on the surface of the roadway and extending between the markers. . . .

"Section Nine. It shall be unlawful to drive, or cause to be driven, any vehicle in, through or across any safety zone authorized by this ordinance, after such zone shall have been laid out. . . .

"Section Eleven. Any person, firm or corporation that shall violate any of the provisions of this ordinance shall be deemed guilty of a misdemeanor."

Plaintiff's petition alleged that "defendant City of St. Louis maintained in said Easton Avenue . . . traffic buttons or markers which were elevated above the surface of said street; *that said traffic buttons or markers were in disrepair and were dirty, discolored, unlighted, unpainted, partially sunken and without proper reflectors;* that said traffic buttons formed obstructions to travel and by reason of their aforesaid presence and location and condition caused said street and sidewalk there to be and remain in a dangerous, unsafe and defective condition, in which condition they were not reasonably safe for use and travel;" and that "defendant George Rogul negligently and carelessly caused and permitted his automobile to collide with the aforesaid traffic buttons or markers." Plaintiff had substantial evidence to prove the above italicized allegations. (Defendant Rogul said that he knew the buttons were there and saw the stop sign. He told the police at the time that another car struck him from behind. He testified that he "didn't know what happened.") Plaintiff contends that, although the city had the right to put such "traffic buttons" in the street, it will be liable for injuries caused thereby unless they are "so maintained that they will be brought to the attention of travelers by reflectors, lights, or bright colored paint;" and that in this case the negligence of the driver combined with negligence of the city, in failing to properly maintain the visibility of these buttons, to cause the automobile to run on to the sidewalk. Plaintiff contends that this was a violation of the nondelegable duty of the city to keep its streets in a reasonably safe condition as stated in such cases as Nimmo v. Perkinson Bros. Const. Co. (Mo.), 85 S. W. (2d) 98, and Boyd v. Kansas City, 291 Mo. 622, 237 S. W. 1001.

The city contends that its demurrer to the evidence should have been sustained "because the safety zone was installed by the city as a part of a general plan for public safety and traffic regulation (and the city was thus acting in a governmental capacity) its maintenance is therefore also a continuance of such governmental function, and the city is not liable for negligence in maintenance." The question then is whether the maintenance of these devices was a corporate or governmental function. [For recent criticisms and suggestions with respect to this basis of liability see 16 Oregon Law Review 250, 3 Current Legal Thought 823; Liability in Tort of Municipal Corporations in Missouri, 3 Mo. Law Rev. 275; also 3 Current Legal Thought 113.] The city cites Prewitt v. City of St. Joseph, 70 S. W. (2d) 916, 334 Mo. 1228; Auslander v. City of St. Louis, 56 S. W. (2d) 778, 332 Mo. 145; and Carruthers v. St. Louis, 341 Mo. 1073, 111 S. W. (2d) 32. The two latter cases are in point

on the propositions that traffic regulation is a governmental function; and that the city is not liable for negligence in its regulation; but they do not consider the matter of regulation by maintenance of devices attached to the surface of the street which in any way tend to be physical obstructions to traffic. However, the Prewitt case did consider such a device, a stop sign thus described: "The sign is oval in shape, 12 by 18 inches at the base, 5 or 6 inches in height, and was fastened securely to the street. The word 'Stop' on the east side of the sign was in red letters with a white background. The balance of the sign was red. It was a warning to west-bound travelers about to enter the intersection. . . . The sign had the appearance of rusty iron. It had been in that condition for some time (before plaintiff's injury). Furthermore, after rains, debris would be around the sign. In due course the street sprinkler washed away the debris."

The plaintiff, in the Prewitt case, was injured by falling from his motorcycle when it ran against this stop sign. He alleged as negligence (among other charges) "maintaining the sign in the street in an obscured condition." This court held the city not liable, saying:

"Formerly traffic in a city was directed and regulated solely by the police department. But the advent of paved roads and the motor have so increased travel and the speed of vehicles that it is necessary to regulate traffic at almost all of the street intersections in a city. It is beyond the power of the police department to do so through the limited personnel of the department. In this situation efforts have been made to substitute for the policeman a signal or sign device as a means of regulation. It appears from the evidence that cities have used different types of signs for this purpose. The sign in question was selected by the board of public works to be used for the regulation of traffic at dangerous places and intersections. Of course, the sign was an obstruction to travel. It was so intended. It was to prevent injury to persons and damage to property resulting from the unregulated movement of vehicles through the intersection. It may be that an occasional vehicle ran against the sign. If so, and it was moving at reasonable rate of speed, the damage, if any, could not be serious. Furthermore, the protection to the public by such regulation greatly outweighs the injuries caused by carelessly driving against the sign. As a means of regulation, the plan adopted by the board was reasonable."

We do not see how this case can be distinguished from the Prewitt case. In both, a charge of negligence against the city was poor visibility of the devices. In both, the devices used were intended to be to some extent obstructions to traffic for the protection to the public. They could not usefully serve the purpose for which they were intended (as markers to designate restrictions on traffic use) unless

they did rise above the surface to some extent. In both cases, the devices were used throughout the whole city at all similar places. They were also generally used in other cities at such places so that it might reasonably be anticipated that everyone would expect them at such places. In both, the devices were placed under authority of an ordinance which made it unlawful to run over them, and it seems reasonable to expect obedience to such regulations. Plaintiff points out that there was an issue of contributory negligence in the Prewitt case. However, this court did not rule the case on that ground, but held that "the city is not liable for the performance of its governmental duty to regulate traffic by the location and *maintenance* of the sign at the intersection." [For other traffic button cases see Denver v. Forster (Colo.), 1 Pac. 922; Dist. of Columbia v. Manning (C. C. A.), 18 Fed. (2d) 806.] Plaintiff also relies upon Mengel v. City of St. Louis, 341 Mo. 994, 111 S. W. (2d) 5. In the Mengel case "the automobile in which plaintiff was seated collided with a concrete slab or block of concrete about four or five feet square and about eighteen inches high located midway in the intersection. . . . The concrete slab constituted the base whereon had previously been located a light standard, or traffic signal. . . . An automobile had collided with the light standard, knocking it down and destroying it. . . . The damaged light standard had been removed by the city, leaving the concrete base (without lights) in the intersection."

This court held that the city was liable in the Mengel case because it negligently failed to light this obstruction, but pointed out the following distinction between that case and the Prewitt case:

"When the signal light post which had stood on this concrete base was removed leaving this concrete block in the street, *it could hardly be, and is not, claimed that the concrete block, itself and alone, in any way served or operated to regulate traffic.* It then became a mere obstruction in the street which if unguarded or unlighted, or not properly lighted, would likely be, especially in the nighttime, a physical hazard to vehicles on the street at that point."

In this case as in the Prewitt case, the city said by its ordinance, and we hold, that it could reasonably be said that the device used (traffic button complying with the specifications of the ordinance), "itself and alone," in not only some way but solely "served or operated to regulate traffic." We hold that this factor, which distinguishes this case and the Prewitt case from the Mengel case, makes the maintenance of the device an exercise of governmental rather than corporate function.

Nevertheless, regulation of traffic by means of an inherently dangerous unlighted obstruction or plan could also violate corporate duties as to safety of streets, but we hold that the evidence (viewed most favorably to plaintiff's case) shows that "as a means of regula-

tion, the plan (and device specified by the ordinance) was reasonable," as held in the Prewitt case, that is, reasonably safe as placed and used. The ordinance authorized yellow paint and "frog eye" reflectors but did not require them. We cannot find that, even without them, these safety buttons were inherently dangerous obstructions, like the straight sided concrete block, 18 inches high, in the Mengel case, or like those devices described in the cases reviewed in the Auslander case. In Metz v. Kansas City, 229 Mo. App. 402, 81 S. W. (2d) 462, cited by plaintiff, the safety island involved was considered by the court to be an inherently dangerous structure and also was located at a place where it was not likely to be expected or seen because of the surrounding topography. Use of these devices, commonly used by cities all over this country as safety zone markers, made with convex surface and less than six inches in height, cannot be said to be a violation of the corporate duty of the city as to the safety of streets. It seems unreasonable to believe that they could cause damage unless the driver of a motor vehicle, not only committed a misdemeanor in violation of the ordinance but also drove in a most unusual and careless manner. These devices, without reflectors or bright paint, must be held to be reasonable, for the exercise of the governmental function involved, when they are installed only at regular and expected loading places for passengers on streets which have street car tracks (which tracks themselves are then notice that there will be such buttons at all regular stopping places); and when damage could only be anticipated to result from unusual, unlawful, and unreasonable conduct. Under the circumstances here shown, we must hold, following the Prewitt case, that "the protection to the public by such regulation greatly outweighs the injuries caused by carelessly driving against" these buttons; and that failure to maintain high visibility of such buttons used for the purpose of marking such safety zones at regular stopping places for street cars in not actionable negligence.

The judgment against the City of St. Louis is reversed. *Ferguson, C.,* absent; *Bradley, C.,* concurs.

PER CURIAM: The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur, except *Lucas, J.,* not sitting.