HERMAN J. HAUCK v. KANSAS CITY PUBLIC SERVICE COMPANY, A CORPORATION, AND KANSAS CITY, MISSOURI, A MUNICIPAL CORPORATION, —200 S. W. (2d) 608.

Kansas City Court of Appeals. February 3, 1947.

*David M. Proctor, Henry Arthur,* and *John J. Cosgrove,* Attorneys for Kansas City.

*Charles L. Carr, R. Carter Tucker, John Murphy, Wililam H. Wilson, Robert L. Spurriėr,* for appellant Kansas City Public Service Company.

*Paul C. Sprinkle, William F. Knowles,* and *Sprinkle & Knowles,* for respondent.

BLAND, P. J.—This is an action for damages for personal injuries to plaintiff and to an automobile owned by him. There was a verdict and judgment in favor of plaintiff in the sum of $2500, and defendants have appealed. There were two separate appeals but they have been consolidated in this court so that one opinion will dispose of the issues in both.

The casualty that gives rise to this action occurred shortly after nine p. m., on February 12, 1944, when plaintiff drove his automobile off of an abutment to the south of and adjacent to a trestle owned by the defendant, Kansas City Public Service Company. The abutment is situated about 76 or 78 feet south of North Ward Parkway (an east and west street) and directly south of the end of Belleview Street, a north and south thoroughfare, entering North Ward Parkway but not extending south thereof. There are a double set of street car tracks laid in Belleview, which extend across North Ward Parkway and south thereof over the trestle.

Plaintiff testified that he was 67 years of age; that he resided in Valley Falls, Kansas; that on the day in question he was in Kansas City to visit his wife who was a patient in Bell Memorial Hospital; that on the evening in question he had eaten at a restaurant on Broadway near the Ambassador Hotel and was on his way back to the Hospital intending to turn west on 39th Street, which was south of the restaurant; that he did not notice that he was crossing 39th Street until he had passed beyond the center thereof; that instead of turning back he thought that it would be better to proceed on and turn to his right and get back on 39th Street; but he got lost and later made inquiry as to the way to the Hospital; that he drove into

North Ward Parkway and along the same toward the west looking for the street car tracks to which he had been directed as being on his route to the Hospital; that he was a stranger in the city and had not been on North Ward. Parkway prior 'to that time;. that he traveled several blocks on North Ward Parkway before he came to' any street car tracks; that he was travelling at a rate of speed of about 15 miles per hour when he came to a double set of street car tracks; which he afterwards found to be laid in the center of Belleview Street, across North Ward Parkway and thence to the south over the trestle in question, that he thought he was north of the Hospital; that he a turn in the curbing; that it appeared to him that the paving turned to the left, or south; that he did not recollect whether he slowed down his automobile but he thought that he did, making the turn to the south at an angle of about 45 degrees toward the farthest of the southbound rails of the car tracks; that he proceeded on down the farthest or west rail veering somewhat to the right for a distance (the evidence shows) of 76 to 78 feet south of the south line of Ward Parkway when he went off of the west side of the trestle, his car falling 20 feet to the bottom of Brush Creek, which the trestle spanned.

The evidence shows that there is a street known as North Ward Parkway and South Ward Parkway, which have between them a strip of parking owned by the city, and that Brush Creek runs along this parking. We are here concerned with only North Ward Parkway and hereinafter we will refer to the street as merely Ward Parkway.

The evidence shows that Ward Parkway, as Belleview Street is 34 feet 6 inches in width; that Belleview Street is 36 feet 3/4 inches in width; that Ward Parkway does not join Belleview, which is a north and south street, at right angles, but it runs in a northeasterly and southwesterly direction; that there is a curbing on the south side of Ward Parkway but no sidewalk; that the Public Service Company has a casement over the parking immediately south of Ward Parkway. No part of this parking constituted a public street or highway of the city. The width of the casement is not shown in the evidence. It is shown that the Public Service Company, under its franchise with the city, is required to pave between its tracks and 18 inches on each side thereof. However, this requirement does not extend to places where its tracks are not on a public thoroughfare. The evidence shows that there is an opening in the curbing on the south side of Ward Parkway 26 or 27 feet in width; that there is no turn in the curbing at a point where it leaves off on either side; that there has never been any curbing at this point, that, while there was no obligation on the part of the Public Service Company to do any paving south of Ward Parkway, it did pave a portion of its tracks south of the south line of Ward Parkway for a distance of 4.6 feet along the western most rail and 12.4 feet along the eastern most rail of the double tracks and 18 inches on each side thereof. A line drawn along the south end of this paving

is at right angles with the track, the difference in the length of the paving on either side being due to the angle at which Ward Parkway crosses the tracks.

The evidence shows that it is 4 feet 8½ inches between the rails of each track and 5 feet between the two sets of tracks; that the south curb of Ward Parkway east of the track ends two to four feet east of the east rail of the northbound track; that on the west side of the tracks the curb stops at a storm sewer 7 feet west of the west rail of the southbound track. There is a reflector sign with six red reflectors between the two tracks. This sign is 2 feet 4 inches high, 6 inches in width and has six red reflectors that cover a space of 6 inches in width and 18 inches in length and start one foot 6 inches from the ground. This sign is 10.6 feet south of the end of the pavement last mentioned and approximately 18 to 20 feet south of the south line of Ward Parkway. There is a street light at the northwest corner of the intersection. Beginning at the south edge of the pavement, put down by the Public Service Company, the tracks are of open construction, i.e., rails, ties and ballast. The ballast extends up to the base of the rails which, in turn, extend upward for 5 inches. The north end of the double track trestle over Brush Creek is 58.6 feet south of the reflector sign, or, approximately 76 to 78 feet south of the south line of Ward Parkway. The trestle was erected in 1910 by the predecessor of the Public Service Company. On the east side of the northbound street car track, and extending south from the south line of Ward Parkway, there is a chat loading platform which was built by the Public Service Company for use by persons boarding northbound street cars. There are two small seats on the loading platform. The platform, itself, is about 50 feet long. There is a fence at the south end of the platform. On the west side of the southbound tracks there is shubbery beginning about 40 feet south of Ward Parkway and extending within about 4 feet of the north abutment of the trestle. This shrubbery runs 4 or 5 feet west of the southbound track. There is a power line pole 12 feet west of the track and 2 trees, one a large one, about on a line with the pole. The trestle has three spans resting on concrete abutments on each bank and two piers out in the creek with steel girders resting on these supports parallel with and under the rails, upon which the crossties and rails rest. The trestle is approximately 85 or 86 feet in length and 18 feet 3 inches in width. There are guard or form rails between the rails of each track, which extend north from the end of the trestle for 16 feet on the south bound track and 14 feet on the northbound track. These guard rails are about 6 inches from the rails on the trestle and come together at their north end at a point or too which point is about 2 feet from each rail. There are also four wooden guard rails on the trestle, one of which is laid on the outside of each of the rails of the track. These guard rails are 14 to 16 feet in length, one situated about 9 inches from each rail, fastened to the crossties.

They are about 8 inches in width and extend up to the top of the rail. The timbers on the trestle apparently never have been painted. They are weatherbeaten and dark gray in color. The pavement on Ward Parkway is described as "black."

Plaintiff testified that while it was dark the weather was fair and the pavement was dry; that, with the aid of his glasses which he had on, his eyesight was good; that his physical condition was good; that his headlights were on and he could see plainly for 100 yards ahead; that he could distinguish objects for that distance; that the lights on his automobile were about 3 feet above the ground. He testified that he had driven his automobile on the highways at night and that the beam from his headlights extended over the slab of the highway and the shoulder, the latter being about 6 feet in width; that at the time in question the street lighting was normal for a road like Ward Parkway; that there was no obstruction to his vision as he approached the street car tracks.

He further testified that he saw the paving, which he said extended about 10 feet south of the south line of Ward Parkway; that he saw no warning signal as he came west before he reached the tracks and none on the south side of Ward Parkway near the street car tracks; that he was probably just to the right of the center of Ward Parkway when he made the turn and at that time he was very close to the street car tracks, probably 10 or 15 feet east of them; that he made an ordinary turn toward the two farthest, or the southbound, rails; that after he made the turn he could see, in front of him, the street car tracks and paving south of Ward Parkway; that after making the turn he saw the rails protruding up from the ground surface; that he did not remember seeing the guard rails on the trestle; that he did not recall seeing the trees west of the track; that he did see the shrubbery west of and parallel to the rails starting shortly south of Ward Parkway and he thought that there was sufficient space between the rails and the shrubbery for an automobile to pass; that he did not see the reflector sign between the tracks, nor the pole with the words "Car Stop" on it at the southeast corner on Ward Parkway; that he did not remember seeing the chat loading zone east of the tracks and did not see the fence at the south end of the loading zone; that he did not notice the sign with the words "Bus Stop" on the corner of Ward Parkway west of the tracks; that he did not see the trestle; that after making the turn he did not slow down until he saw that he was in trouble, which was when his automobile started falling off of the trestle; that he drove 100 to 150 feet from where he turned to the point where he left the trestle, driving astraddle the right, or west, rail of the southbound tracks, with the left wheels between it and the rail immediately to the left. What distance he drove in this manner is not clearly shown by the evidence. He first testified that when he got over the southbound tracks he straightened out astraddle the west rail. Later, he

testified that he "never did get straightened out;" that he had his mind on getting off the track for fear a street car might strike his automobile from the rear and that he continued to veer to his right. He finally testified: "Q. Where you crossed the street car tracks and as you proceeded south, were you running along straddling the rails? A. Straddling one rail. Q. You didn't cross at this point (indicating). You crossed up here at Ward Parkway? A. That's right; Q. Then you were straddle the west rail? A. That's right. Q. And you went south, generally speaking? A. Yes. Q. For about 80 to 100 feet? A. Not that far. Q. From the south curb to where you fell off? A. Yes."

So, it would appear that he was astraddle the rail for a distance starting at, or not far south of, Ward Parkway. He thought that he traveled astraddle the rail to the point where he went off into the Creek but he would imagine that he swerved to the right. He did not know just where he did this. The evidence shows that he did not go off of the trestle proper but rather the abutment adjacent to the trestle, for the reason that there were some marks on the west side of the trestle, and in going off he broke some limbs off of a tree. He testified that his automobile was in perfect mechanical condition; that he could stop within 5 to 10 feet after applying his brakes and in an emergency he could stop within 5 feet.

We will first take up the appeal of the City.

It is insisted by it that the court erred in failing to give its motion for a directed verdict for the reason that no liability was shown on the part of the City, and, even if the City were liable, the plaintiff was guilty of contributory negligence, as a matter of law.

Plaintiff seeks to recover on the theory that the conditions present were such as to constitute an invitation to the public to use that portion of the parking in question south of Ward Parkway and that it was the duty of the City to place guard rails along the south side of that street to prevent persons from driving off of the street.

It is well established in this state that there is no duty on the part of a municipality to keep its streets in a reasonably safe condition for public travel outside of that portion of the street which is set aside by the city for travel, and it is not liable for injuries received by one traveling on other parts of the street unless he receives his injuries as a result of a defect so close to the traveled part as to endanger the public while using such street in an ordinary manner for the purpose for which such street was intended and improved. It is not required to maintain in a safe condition a driveway extending from the paved portion of the street across the parking thereof into private property by reason of the fact that it is extensively used by the public at the invitation of the owner of such property. [Griffin v. City of Chillicothe, 297 S. W. 84; Sparks v. Kansas City, 160 S. W. (2d) 819; Clinkenbeard v. City of St. Joseph, 10 S. W. (2d) 54.]

In the Griffin case the Chamber of Commerce of the City of Chillicothe maintained a public hitch yard near a north and south public street in that city which was 100 feet wide but which had been paved only to the extent of 30 feet. Three places in the curbing on the east side had either been left flush with the pavement or had been cut down to such level to permit ingress and egress from the abutting property. Two of the openings were opposite the hitch yard maintained by the Chamber of Commerce. The other opening was upon the north side of the lot adjacent to the hitch yard on the south. The latter opening was used by teams and wagons moving along the street in question from the south into the hitch yard and by those persons leaving the hitch yard and going south on said street. Plaintiff in driving his team and wagon north on the street in question turned into the south opening in the curbing to drive into the hitch yard. His right front wheel dropped into a chuck hole existing in the roadway over the parking just inside the curbing and outside of the paved portion of the street, resulting in his injury. It was held that the city was not liable for the defect which caused plaintiff's injury, it being without the limits of that part of the street improved by the city to be used by the public and it made no difference as far as the liability of the city was concerned that the defect was located within the legally located street or highway but outside of the part thereof set aside for use by the public, and that there was no invitation on the part of the city to the traveling public to use that part of the street where plaintiff was injured.

In the case at bar there is no evidence of any use of that part of the place in question south of Ward Parkway by vehicular traffic, but even had it been so used the city would not have been liable for the condition causing plaintiff's injury. As we view it, the loading platform plays no part in the case insofar as to assist plaintiff in any way. Under the ruling in the Griffin case the city would not be responsible for anything that occurred on the loading platform which was for pedestrians. Even though the city had set aside that part of the parking for use by pedestrians, it would not have been an invitation to drivers of automobiles to use it. [25 A. J. p. 724.] So, there is nothing in the case indicating that the city is liable for any one injured by reason of any unsafe condition existing south of Ward Parkway.

The abutment at the trestle, over which plaintiff's automobile fell, was not so near Ward Parkway as to impose any duty on the city to guard against injuries to persons using that highway. In the Sparks case, this court quoting from an opinion of the Springfield Court of Appeals, said, l. c. 822: "The duty to guard and warn against things extraneous as to the sidewalk does not arise until the object of danger is so near the sidewalk as to be dangerous to those on the *sidewalk*." Of course the same rule applies to use of a street. It is well settled that there is no duty upon a city to erect guards to prevent drivers from

leaving that part of the highway set aside for use by the public. [25 A. J. pp. 817-820; Sparks v. Kansas City, *supra*.]

It is quite apparent that plaintiff cannot recover on the theory that the city should have put up barriers along the south side of Ward Parkway to prevent drivers of automobiles from driving off into the place in question, and that the city can not be held on the theory that by reason of appearances it invited drivers of vehicles to enter upon that part of Ward Parkway where plaintiff was injured.

There are two cases in this state upon which plaintiff, chiefly, relies on the question of invitation. These are Chance v. City of St. Joseph, 190 S. W. 24 and Williams v. City of Mexico, 34 S. W. (2d) 992.

In the Chance case the city failed to maintain barriers across a public street where it abruptly ended at the very edge of a precipice. In the Williams case there was a street in the City of Mexico that ended at the city limits which had a connection with an abandoned state highway outside the limits. At a point where the state highway originally connected with the street there had been a bridge, the west approach of which was 36 feet east of and outside the east limits of the city, whereby a continuous thoroughfare was made by way of the street and the highway into and out of the city. Plaintiff, without knowledge of the conditions present, drove his car over the street in the night time on out over the old road, which appeared to be a continuation of the street, and over a stone abutment which had formerly supported the west end of the highway bridge which spanned a creek. As before stated, the stone abutment over which the car was driven was only 36 feet east of and outside the limits of the city. It was held that the city was liable in these two cases because it failed to use ordinary care in maintaining the streets in question in a reasonably safe condition for their use by drivers of vehicles; that it was its duty to maintain suitable barriers at such places. How do the facts in this case compare with the facts in the case at bar? Here there is no evidence that any driver of a vehicle had ever used that portion of the parking on South Ward Parkway, although it is true that that portion of the parkway south of Ward Parkway was immediately to the south of the end of Belleview Street. It was not left in condition by any one so that it could be used. There was no highway leading up to the abutment, such as appears in the Williams case, and there was nothing to indicate to a person using the highest degree of care, in driving his automobile, that it had been prepared for use by vehicles.

It is true, there was a narrow opening in the curbing of Ward Parkway and a few feet of pavement between the street car tracks and 18 inches on the side of each south of Ward Parkway; this paved portion being much narrower than Belleview Street. If this was sufficient to indicate that this part of the parking was to be used by vehicles, there are other things about the situation clearly indicating to the contrary. There was a warning sign 10.6 feet south of the south end of this

narrow strip of paving between the two sets of street car tracks, and the space between the paving and the trestle or abutment, approximately 58.6 feet, was of open construction, with a rail extending 5 inches above the ground. There was a row of shrubbery along a portion of the tracks within 4 or 5 feet of the west rail of the southbound tracks; there were trees, one large one, within 12 feet of that track; there was no roadway west of that track; there was a trestle ahead with eight guard rails, aside from the tracks thereon themselves, there was a fence along the south side of the loading platform along the east track. Viewing the situation as a whole there was nothing to indicate to th driver of a vehicle that any space south of Ward Parkway was open for the use of drivers of vehicles. The facts in this case are in no way comparable to those in the Chance and Williams cases.

Plaintiff claims that the warning sign was so situated that a person driving westerly along Ward Parkway, and making a turn such as he made, would not see it with the aid of his headlights, although it appears to be admitted that it would have been seen by a driver approaching from any other direction or viewpoint. However, we are unable to comprehend how it was possible for plaintiff to have passed this sign, while driving astride the west rail of the southbound track, in other words, passing it within a distance of less than 7½ feet, without seeing it, were his attention directed upon where he was going. Plaintiff admitted that he could see 6 feet laterally with the aid of his headlights. This we assume to be immediately to the side of this head lights or shortly in front thereof. Of course, the rays of headlights widen as the distance from the object in front increases and there is no question but that there were times, while plaintiff was making his turn to the left, that this warning signal was in full view, to say nothing of when he straightened out. The Supreme Court has held that the courts will take judicial notice of the fact that the rays from headlights extend laterally a considerable distance, as well as forward. [See Grimes v. St. L. & S. F. Ry. Co., 106 S. W. (2d) 462, 465.] Plaintiff is held to have seen what he could have seen but even had there been no warning signal plaintiff was not invited to use the space into which he turned.

We are of the opinion that there is no liability on the part of the city as related to either of its streets in the vicinity of the trestle.

We have examined Birkhimer v. City of Sedalia, 200 S. W. 298; Boyd v. Kansas City, 237 S. W. 1001; Metz v. Kansas City, 81 S. W. (2d) 462; Plater v. Mullins Construction Co., 17 S. W. (2d) 658; Benton v. City of St. Louis, 217 Mo. 687, and other cases cited by plaintiff, and find them not in point. These cases all involve an unsafe condition in, over, or adjacent to, the traveled portion of a street or highway.

The defendant, Kansas City Public Service Company, insists that the court erred in failing to give its instruction for a directed verdict, for

1104

the reason that no liability was shown as to it, and that plaintiff was guilty of contributory negligence, as a matter of law.

What we have to say relative to the liability of the Public Service Company applies also to the city in its proprietary capacity, if any, as owner of the parking in question.

The Public Service Company is the owner of an easement crossing the parking where the casualty occurred. The question to be decided is what duty it owed persons using the public streets in that vicinity. The easement consists of private property and unless the Public Service Company did something to invite drivers of vehicles thereon, or maintained a condition so near the public highway as to make the highway, itself, unsafe, there can be no liability on its part. [See Moran v. Pullman Palace Car Co., 134 Mo. 641, 650; Overholt v. Vieths, 93 Mo. 422, 427.] In the latter case THE COURT said (quoting from a standard text book) : "The occupant of land is under no obligation to strangers to place guards around excavations made by him, unless such excavations are so near a public way as to be dangerous, under ordinary circumstances, *to persons passing upon the way,* and using ordinary care to keep upon the proper path, in which case he must take reasonable precautions to prevent injuries happening therefrom to such persons." (Italics ours.)

On the question of invitation it has been held that the fact that a private driveway leading from a public highway is paved does not constitute an invitation to the public to use it and no duty is entailed upon the owner to put up a sign notifying travelers to keep off of it although it may be in disrepair. [See Stevens v. Nichols, 15 L. R. A. 459 (Mass.)] In that case (l. c. 461) THE COURT said: "Nor can the fact that the passageway was paved be considered an invitation or inducement to the public to enter upon it for their own convenience. The defendants have a right to have it paved for their own use, or for the use of their customers." [See, also, Bennett v. City of Mt. Vernon, 276 N. Y. S. 205.] Not even a private driveway is involved in the case at bar. There is no evidence that the Public Service Company ever used its tracks for anything but street cars or invited, at least expressly, any driver of a vehicle to use that portion of its right of way in question. Even where a person uses a private driveway for his own convenience, with the knowledge of the owner, he is merely a licensee, and the owner is under no obligation to keep it in repair with respect to the obvious risks which confront him. [Eisenberg v. Mo. Pac. Ry. Co., 33 Mo. App. 85.]

There are cases holding that there may be an implied invitation on the part of the owner of premises abutting a highway to go upon such premises but these cases are mainly where a merchant or a nearby owner paved the space between his building and the sidewalk, using paving similar to, and level with, the sidewalk. [See Leighton v. Dean, 117 Me. 40.] There are authorities holding that there can be a

recovery on the theory that the owner of private land is under the general duty to use due care to prevent persons from being injured while using a way thereon because of an implied invitation to use it where the owner has permitted the public, generally, to use it under such circumstances, and for such a length of time, as to indicate that it is a public passageway, in which case it is incumbent on the owner to use due care to prevent persons being injured thereon. [See Beck v. Carter, 68 N. Y., 283, 289, 291, 293.] (Whether the law of Missouri supports such a doctrine we need not say.) It is the law that where a person uses a private driveway without the invitation of the owner he is a trespasser and the owner is not liable for failure to keep it in repair, and it is not a question of appearances, or what the plaintiff supposes from the appearances, but simply whether defendant has failed in any duty which he owes plaintiff. [Cusick v. Adams, 21 N. E. 673 (N. Y.); Bennett v. the City of Mt. Vernon, *supra.*]

In the case at bar there is not even as much as a private driveway involved. There was no invitation of any kind from the Public Service Company to use its right of way and, as to it, plaintiff was merely a trespasser and it is not liable. It would appear that plaintiff received his injury as a result of his own inattentiveness to the situation surrounding the place where the casualty occurred.

It follows that the court should have sustained the motions for a directed verdict as to both defendants.

. The judgment is reversed. All concur.