Doris E. WATSON and William L. Watson, Respondents,

v.

KANSAS CITY, Missouri, Appellant.

No. 56432.

Supreme Court of Missouri, En Banc.

Sept. 10, 1973.

Rehearing Denied Oct. 8, 1973.

Von Erdmannsdorff & Kuhlman, North Kansas City, Philip C. Ehli, Kansas City, for respondents.

Aaron A. Wilson, Jr., City Counselor, Robert A. Dakopolos, Charles A. Lewis, Associate City Counselors, Kansas City, for appellant; Sevier & Turnage, Robert F. Sevier, Liberty, of counsel.

HOLMAN, Judge.

Plaintiff, Doris E. Watson, was seriously injured when the car she was driving "overshot" a T intersection and continued down a rock-strewn hillside 55 feet before coming to a stop. She filed this suit seeking damages from the City of Kansas City, based upon the contention that her injuries resulted from the failure of the City to warn of the dangerous condition existing at that place. Her husband joined in the action and sought a recovery for loss of her services and consortium. A trial resulted in a verdict for Doris in the amount of $75,000 and for William in the sum of $10,000. Defendant has appealed. We have jurisdiction because of the amount involved since the appeal was taken prior to January 1, 1972, the effective date of new Art. V, § 3, Mo.Const., V.A.M.S. We reverse.

Plaintiff[1] was employed at a plant in Grandview which was 17 miles from her home. On the morning of January 22, 1968, the unexpected illness of the man with whom her husband rode to work made it necessary for her to take him. Because of that situation she knew she would be late to her work. They left home shortly after 6 a.m., and when they arrived at the place where William worked he told her to go north on North Manchester for about a mile to Levee Road and then turn left. There was a slight mist in the air and there were intermittent patches of fog. It was still dark and the roadway was damp.

Plaintiff testified that she had never been over this road and did not know that North Manchester formed a T intersection with Levee Road; that she was driving at 20 to 25 miles per hour and, after going ¾ of a mile, she came out of a blanket of fog and saw the sign for Levee Road; that there had been no signs warning that this was a T intersection; that she started to put on her brakes but that she had no idea whether the car started to slow down before it left the roadway; that she did not "jam" on the brakes for fear of spinning the car around; that she could not see the trees in the area beyond and assumed that North Manchester extended beyond the in-

---

1. We hereinafter refer to Doris in the singular as plaintiff.

tersection; that she intended to make a normal stop and then either back up or turn around in order to go left on Levee Road; that she saw no other vehicles and was "pretty sure" she could have made her turn if she had been familiar with the road; that a car length is 15 or 20 feet, and she had no idea of the stopping distance of a car going 20 or 25 miles per hour; that she continued north, went across the width of Levee Road, the shoulder, and then down the embankment; that after leaving the shoulder the land does not drop "straight off" but slopes down the hillside.

A police officer who investigated the accident testified that North Manchester and Levee Road were each about 35 feet wide; that the car stopped 55 feet from the roadway and that the hillside dropped 25 or 30 feet in that distance; that he found plaintiff in a "more or less" stunned condition; that no skid marks were made by plaintiff's car.

In answers to interrogatories defendant stated that it had no record of any signs, signal, or control devices on North Manchester within 500 feet of the intersection in question. There is no evidence as to the width of the shoulder on the north side of Levee Road but both sides accept the assumption that it was from four to seven feet.

Hillard Jackson, a witness for defendant, was on the premises of the city Refuse Plant near the intersection in question. He testified that he saw plaintiff's car go by and would estimate her speed at 40 miles per hour; that he had a service truck radio for help and then went to the plaintiff's car; that the levee slants at a 45° angle. Over objection, he was permitted to testify on cross-examination that other vehicles had "slipped off the levee."

Another eyewitness who saw the car go over the embankment said it was "moving pretty fast."

The plaintiff's claims were submitted to the jury upon a required finding,

"First, that the roadway on which plaintiff, Doris E. Watson, was traveling ended abruptly and there was a dangerous declivity at or near the edge of the roadway, and

"Second, the defendant knew or by the use of ordinary care should have known of the existence of such condition, and

"Third, the defendant failed to warn of such dangerous condition."

We have concluded that the trial court erred in failing to direct a verdict for defendant or to enter an after-trial judgment for it. This for the reasons (1) that the installation of a traffic device or sign to warn of the T intersection would have been a governmental function, and negligence, if any, in respect thereto imposes no liability on the city; and (2) even if we disregard the governmental immunity doctrine, there is no duty on the defendant to warn of the danger of driving off the street in a situation such as the one heretofore described.

■ This court has said that "[I]t is well established that a municipality is not liable in tort for the negligent performance of its governmental as distinguished from its corporate functions. Cassidy v. City of St. Joseph, 247 Mo. 197, 152 S.W. 306; Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485; Auslander v. City of St. Louis, 332 Mo. 145, 56 S.W.2d 778; Carruthers v. City of St. Louis, 341 Mo. 1073, 111 S.W.2d 32; Blackburn v. City of St. Louis, 343 Mo. 301, 121 S.W.2d 727. See also 18 McQuillen, Municipal Corporations, 3d Ed., § 53.23. And it has repeatedly been held, and plaintiff concedes, that the regulation of traffic is a governmental function. Prewitt v. City of St. Joseph, 334 Mo. 1228, 70 S.W.2d 916; Auslander v. City of St. Louis, supra; Carruthers v. City of St. Louis, supra; Blackburn v. City of St. Louis, supra." Hiltner v. Kansas City, 293 S.W.2d 422, 425 (Mo.1956). Many other applicable cases are discussed in Gillen v. City of St. Louis, 345 S.W.2d

69 (Mo.1961), and such discussion need not be repeated here.

In 18 McQuillen, Municipal Corporations, § 53.42, it is said that "[M]any courts have decided that a city functions in a governmental capacity in maintaining traffic signs, and in the operation of a traffic light system. Where this broad general rule is in effect, it follows that a municipality may not be held liable for an injury caused by the disintegration of a stop sign, or by the city's failure to replace a missing stop sign, or for an injury resulting from the failure to keep traffic lights functioning properly."

As indicated by the cases cited, it seems to us that there can be no reasonable argument concerning the validity of the proposition that the placing (or failure to place) of a sign on North Manchester to warn that the intersection in question was a T intersection is a form of traffic regulation, direction, or control, and hence a governmental function. It follows that there would be no liability on defendant for its alleged negligence in failing to install such a sign on North Manchester.

We have not overlooked the well-settled rule that it is the duty of a city to exercise ordinary care to keep its streets in a reasonably safe condition for travel and that it is liable in damages for its failure to do so. In this case, however, there is no contention that there was any defect or obstruction in the streets that made up this intersection and hence this rule would have no application.

Alternatively, plaintiffs have asked that, in the event we consider the doctrine of governmental immunity applicable, we review that doctrine and overrule it insofar as it applies to municipal corporations. We have frequently been asked to re-examine this doctrine and to abolish it by judicial decree but have steadfastly ruled that any change in the application of the doctrine should be accomplished by legislative enactment. See Fette v. City of St. Louis, 366 S.W.2d 446 (Mo.1963), and Smith v. Consolidated School District No. 2, 408 S.W.2d 50 (Mo.1966). There are two reasons why we consider it unnecessary to re-examine the doctrine in this case. The first is that Division Two of this court very recently reviewed the soundness of the doctrine and rejected a request for the wholesale abrogation of it in the case of Payne v. County of Jackson, 484 S.W.2d 483 (Mo.1972). Secondly, we hold herein that plaintiffs, aside from the immunity doctrine, are not entitled to recover.

As indicated, it is our view that the City is not liable because it had no duty to warn in the situation here presented. "It is well settled that there is no duty upon a city to erect guards to prevent drivers from leaving that part of the highway set aside for use by the public." Hauck v. Kansas City Public Service Co., 239 Mo. App. 1092, 200 S.W.2d 608, 613 (1947). An exception to that rule is that a city is liable for injuries sustained by reason of its failure to barricade or warn of an excavation or other dangerous condition which is so near to the traveled portion of the street that a pedestrian, by accidental misstep or a vehicle occupant by a slight inadvertent deviation, is caused to be injured. Lavinge v. City of Jefferson, 262 S.W.2d 60 (Mo. App.1953). That exception is not applicable in this case. This T intersection was not particularly dangerous. There were no defects or obstructions in the street itself. It was an ordinary T intersection and was no more dangerous than most all such intersections. Of course, almost every T intersection or jog in a street is dangerous if a driver goes through the cross street and departs into the area beyond. In most instances he would strike a building, tree, retaining wall, or other object that would cause injury. That was the type of situation plaintiff encountered. The north side of Levee was fairly level for a distance of from four to seven feet beyond the edge of the street and then descended into a rough and rocky area. Plaintiff's car came to rest

55 feet from the street. That was not a slight deviation but a complete departure from the area of the intersection. The defendant was not required to anticipate that a driver would leave the traveled portion of the street in that manner. In fact, plaintiff testified that she thought she could have made her anticipated turn, after seeing the Levee Road sign, if she had been familiar with the intersection.

Our decision is supported by a number of cases which we will briefly review. In Lavinge v. City of Jefferson, supra, the T intersection was very similar to the one in the case before us. The plaintiff's automobile went across the intersecting street and struck a low concrete wall erected along the street frontage of the abutting private property. In holding that the city was not liable for failure to barricade or warn, the court stated: "It cannot be said that the course taken by the operator was a slight or inadvertent deviation from the traveled portion of the highway provided by defendant, but a complete departure from the street over a course not shown ever to have been used for travel. Nor can it be said that the presence of grass and high weeds across the far side of the turn and in front of the abutting property was not reasonable notice and warning that the course of the street changed at that point and did not continue straight ahead. To require a city to barricade or to erect signs at all such turns in its streets to prevent its users from proceeding on into private property abutting such turns would be more than the law exacts." 262 S.W.2d 64.

In Clinkenbeard v. City of St. Joseph, 321 Mo. 71, 10 S.W.2d 54 (1928), the city was held not liable where plaintiff's car struck a utility pole located on the parkway about two feet from the street. In so ruling, the court stated: "It is palpable and plain that, had not plaintiff driven his automobile off the traveled and improved roadway, and over the 6 or 8 inch protecting curb which marked and designated its boundary, his automobile never would have collided with the pole within the parkway.

The pole, according to the evidence, was not erected and maintained so close to the traveled and improved vehicular roadway as to endanger any one using such traveled and improved portion of the street in the ordinary manner and for the purpose for which such roadway was intended and improved. * * * In almost every city of size in the state, some streets and traveled roadways are laid out and improved without uniformity as to width of roadway or direction; that is to say, 'jogs,' 'goosenecks,' and cul-dé-sacs are of more or less frequent existence in all of the cities of the state, especially in residential districts; and to judicially say that, at every such place, a municipality must maintain some barrier or warning device, is more than we think the law requires." 10 S.W.2d 62.

Another somewhat similar case is Sparks v. Kansas City, 236 Mo.App. 710, 160 S.W.2d 819 (1942). There the car in which plaintiff was riding continued straight ahead at a sharp curve in the street on a dark foggy night and went over a precipice some distance away. In holding that plaintiff could not recover the court stated: "[W]e are unwilling to hold that the city must be charged with the knowledge that a pedestrian or an automobile driver on the street or sidewalk will leave the well defined improved part of the street or sidewalk which has been set aside by the city for use and wander off on property or in territory which the city has not designated and prepared for travel; and that the city should be required to erect fences, barricades or signs to prevent such wandering. There is no state statute or city ordinance, of which we have any knowledge, making such requirement and we do not believe the common law makes any such requirement." 160 S.W.2d 822.

Other cases supporting our view are Hauck v. Kansas City Public Service Co., supra; Bassett v. City of St. Joseph, 53 Mo. 290 (1873); Griffin v. City of Chillicothe, 311 Mo. 648, 279 S.W. 84 (1925); Belt v. City of Grand Forks, 68 N.W.2d 114 (N.D.1955), citing with approval four

Missouri cases; and Henderson v. City of St. Paul, 216 Minn. 122, 11 N.W.2d 791 (1943).

Plaintiff contends that the City had a duty to warn because the dangerous declivity existed in close proximity to the traveled portion of the streets involved and thus was a hazard to her while operating her car on those streets. As heretofore indicated, we do not agree. If plaintiff had attempted to make the turn, and her car had veered a foot or two from the paved portion of the street into an excavation or other dangerous situation, her contention might be considered valid. But, as heretofore stated, that was not the situation. There was a level area of from four to seven feet north of Levee Road before the hillside began to descend. Plaintiff was injured because she made a complete departure from the roadway for a distance of 55 feet.

The cases upon which plaintiffs rely are all distinguishable upon the facts from the instant case and do not support their contentions. For example, in Chance v. City of St. Joseph, 195 Mo.App. 1, 190 S.W. 24 (1916), the city was held liable for failure to barricade a public street which ended (not a T intersection) at the crest of a "precipitous declivity." The city was held liable in Williams v. City of Mexico, 224 Mo.App. 1224, 34 S.W.2d 992 (1931), where the unbarricaded street led to a point near where a bridge had been torn down so that the car was driven off a precipice. And in Treon v. City of Hamilton, 363 S.W.2d 704 (Mo.1963), a recently abandoned roadway led to a point where a wide ditch had been dug across the road. The city was held liable for failure to barricade or warn.

In view of the conclusion we have reached on the issues heretofore discussed, we need not consider the defendant's contention that plaintiff was guilty of contributory negligence as a matter of law.

The judgments are reversed.

DONNELLY, C. J., and HENLEY, J., concur.

FINCH, J., concurs in separate concurring opinion filed.

SEILER, J., dissents in separate dissenting opinion filed.

MORGAN and BARDGETT, JJ., dissent and concur in separate dissenting opinion of SEILER, J.

FINCH, Judge (concurring).

I concur on the basis of existing case law, but I continue to hold the view, expressed in my concurring opinion in Wood v. County of Jackson, 463 S.W.2d 834 (Mo.1971), that in an appropriate case we should reexamine the doctrine of governmental immunity. In view of the additional basis for the decision recited in the principal opinion, this case does not present such an opportunity.

SEILER, Judge (dissenting).

Mrs. Watson was driving north on Manchester street on a foggy winter morning in Kansas City near the Missouri River bottoms. She knew she was supposed to turn left when she reached Levee Road. She did not know that Manchester came to a dead end at Levee Road where it formed a "T" intersection with a steep dropoff immediately beyond and out of sight. She thought Manchester continued on north as in an ordinary intersection. A simple banded reflector type sign would have warned her otherwise, but the defendant city erected no such warning sign nor gave any kind of warning and as a result, before Mrs. Watson realized what was happening, she went through the intersection and down the levee embankment.

The principal opinion excuses the city on the ground that the placing of a warning sign is a form of traffic regulation and hence a governmental function which

makes the city immune from liability, and on the further ground that even if there were no governmental immunity, the city was under no duty to warn plaintiff what lay ahead because the city was not required to anticipate that she might leave the intersection as she did and was under no obligation to erect guards to keep her from leaving the traveled portion of the highway.

Myers v. City of Palmyra, 355 S.W.2d 17, 1819 (Mo.1962) states the controlling law: "In Missouri, as in most states, municipalities are not liable as a general rule for torts arising out of what is called governmental functions . . . However, whether the construction, repair, and maintenance be classified as a corporate or proprietary function, Mengel v. City of St. Louis, 341 Mo. 994, 111 S.W.2d 5, or as a ministerial function, Barree v. City of Cape Girardeau, 197 Mo. 382, 95 S.W. 330 . . . or as a governmental function for which there is an exception to the rule that a municipality is not liable for its torts, as implied in Cassidy v. City of St. Joseph, 247 Mo. 197, 152 S.W. 306, under the law of this state 'it is the primary and non-delegable duty of the city to exercise ordinary care to keep its streets in a reasonably safe condition for travel,' Sutton v. Fox Missouri Theater Company, Mo., 336 S.W.2d 85, 92, and to this activity the doctrine of immunity from liability for torts does not apply . . ."

Where the city has a duty to exercise ordinary care to protect travelers by keeping its streets in reasonably safe condition, it cannot breach that duty and then attempt to escape liability for its action or non-action, by contending that the warning would involve a governmental function. The city cannot bootstrap itself into non-liability by invoking the immunity doctrine to extricate itself from its responsibility to exercise ordinary care. The case before us falls within the stated exception to the governmental immunity doctrine. A number of cases, under a variety of circumstances have held that plaintiff made a jury submissible case of negligence on the city's failure to barricade or warn. See Treon v. City of Hamilton, 363 S.W.2d 704, 708 (Mo.1963) [failure to warn or barricade in view of the deceptive nature of the area, the recent relocation of the road, and the continuance . of blacktopped areas except for the ditches]; Williams v. City of Mexico, 224 Mo.App. 1224, 34 S.W.2d 992, 994 (1931) [street continued to the city limits and 36 feet thereafter abruptly ended at a precipice]; Chance v. City of St. Joseph, 195 Mo.App. 1, 190 S.W. 24, 26 (1916) [city required to erect barricade at the end of the street where the appearance was deceptive and there was a dangerous declivity]; Bassett v. City of St. Joseph, 53 Mo. 290, 298 (1873) [city has a duty to protect travelers on the street from excavations outside the street which rendered the street dangerous to travel] as examples.

It is clear from the foregoing cases that where there is a dropoff or declivity which does not give notice of its presence because it is so situated with reference to ground contour or elevation that it cannot be seen by an approaching driver, then a duty arises to make the road or street reasonably safe. How the city chooses to accomplish this varies under the different cases, but the means employed must be such as to warn or notify the driver that the road ends or the dropoff is present, in order that the driver can avoid falling into an unseen trap.

I respectfully submit the case before us cannot be disposed of by lumping it into the category of cases where cities have been held not liable for injuries resulting from municipal activity in controlling or regulating the flow of traffic, such as where an automobile runs into a stop sign [as in Prewitt v. City of St. Joseph, 334 Mo. 1228, 70 S.W.2d 916 (1934)]; or a traffic light has burned out [as in Auslander v. City of St. Louis, 332 Mo. 145, 56 S.W. 2d 778 (1933)]; or a traffic sign falls on top of someone [as in Gillen v. City of St. Louis, (Mo.Sup.1961), 345 S.W.2d 69], referring to cases cited in the majority opin-

ion. In such cases, the city was primarily engaged in regulating traffic and the injury came about not because of a failure on the part of the city to warn of some hidden defect in the street, but by virtue of some failure in the traffic control system. This is completely different from what we have in the present case.

I know of no Missouri cases where a city has been excused from liability where it has failed to give proper warning of the continued existence of a dangerous defect in the street and the majority opinion cites none. In the present case the intersection was dangerous because the road ended abruptly in a dropoff without warning and there was nothing ahead in the way of buildings, trees, walls, etc. at the same elevation to show otherwise. This is the difference between our case and Lavinge v. City of Jefferson, 262 S.W.2d 60, 64 (Mo. App.1953) where the court pointed out that ". . . the presence of grass and weeds across the far side of the turn and in front of the abutting property" was reasonable notice and warning that the street did not continue straight ahead. This distinction was also present in Clinkenbeard v. City of St. Joseph, 321 Mo. 71, 10 S.W.2d 54 (1928) and in the other cases relied upon by the majority opinion, such as Sparks v. Kansas City, 236 Mo.App. 710, 160 S.W.2d 819 (1942) and Hauck v. Kansas City Public Service Co., 239 Mo.App. 1092, 200 S. W.2d 608. In these cases there was some sort of object projecting into the air—a pole, a curbing, treetops, a street car trestle, a sign—which itself gave reasonable notice and warning that the street did not continue and that there was trouble ahead if the driver continued. A driver can see a pole or tree without further warning, but not an unexpected dropoff. In the case at bar there was nothing ahead for Mrs. Watson to see—the ground in fact dropped away rapidly, but to the motorist approaching the intersection as she was there was nothing to indicate Manchester street did not continue on north.

The majority opinion states it is unarguable that a signing warning that the intersection was a "T" intersection would be a form of traffic control and hence a governmental function. However, as pointed out in Auslander v. City of St. Louis, supra, 332 Mo. 145, 56 S.W.2d l. c. 782, ". . . The keeping of a street in a condition reasonably safe for travel thereon has reference to its physical condition, and is a different matter than the regulation of traffic on such street . . . [O]ne relates to the . . . proprietory powers of the city . . . the other relates to its governmental or police powers." It seems to me that a warning sign at this particular intersection is comparable to the red light or lighted flare pot placed at a ditch or excavation in the street. In one sense this could be considered a form of traffic control, because it causes traffic to change course, but its true purpose is to give warning of danger of a defect in the street and that is why the city is held liable in tort in such cases where it fails to give warning of the trap ahead. The same should be true here.

The majority opinion acknowledges the established rule that a city has a duty to exercise ordinary care to keep its streets in a reasonably safe condition for travel and is liable in damages for failure to do so, but says the rule is not applicable because plaintiff makes no contention there was any defect in the streets which make up the intersection. I respectfully submit this is not correct. The plaintiff's theory, as seen in the plaintiff's instruction quoted in the opinion, was that Manchester street was dangerous because it ended abruptly with a dangerous declivity at or near the edge of the roadway. This constitutes a defect in this portion of Manchester street just as much as an unmarked ditch across it would.

The majority opinion in discussing the proposition that even if governmental immunity is not involved the city had no duty to warn under the circumstances of this

case, rests this to no small degree on the theory that the city was not required to anticipate that a driver would leave the traveled portion of the street in the manner which plaintiff did. However, I have always understood that the law of negligence, on the proposition of whether or not there is a duty, does not depend on whether the defendant could foresee the exact injury or the exact method of injury which would result from his carelessness. As correctly said in 57 Am.Jur.2d, Negligence, Sec. 59, p. 411: "It is not a necessary element of negligence that one charged therewith should have been able to anticipate the precise injury sustained. Nor is it necessary that the injury to the plaintiff himself be foreseeable; it is sufficient that the act in question may in human probability produce harm to persons similarly situated. To render one liable for negligence, it is sufficient that he should have foreseen that the negligence would probably result in injury of some kind to some person, and he need not have foreseen the particular consequences or injury that resulted . . . ." See, also, Restatement of Law of Torts, Second, Sec. 281, p. 7, as follows: "In determining whether such events are within the risk, the courts have been compelled of necessity to resort to hindsight rather than foresight . . . ." Looking at this accident in hindsight it is easy to foresee that once the plaintiff or any motorist proceeding at 20 to 25 miles per hour got within a certin distance from or actually into the intersection without realizing that the road on which she was traveling came to an abrupt end, it was highly likely that she would plunge over the edge of the embankment and go however far it was until she reached the bottom. Additionally, the evidence showed this had happened before to other vehicles at this intersection.

The majority opinion mentions four times the fact that plaintiff traveled 55 feet after leaving the roadway before coming to a stop. The majority opinion describes this as "not a slight deviation but a complete departure from the area of the intersection" and says plaintiff "was injured because she made a complete departure from the roadway for a distance of 55 feet." It is said the city was not required to anticipate such a "complete departure" and reasons that any time a driver runs off a "T" intersection he, in most instances, will sooner or later strike some object which will cause injury. The majority opinion concludes this particular "T" intersection "was not particularly dangerous" but rather that it was plaintiff's complete departure from the area which caused her injuries. This carries the implication that Mrs. Watson's act in going 55 feet off the road had a voluntary or intentional cast to it which excuses the city and bars her recovery, and that the departure from the intersection would be more foreseeable and the outcome different if her headlong plunge had been halted only 5 or 10 feet after leaving the roadway.

In my opinion, this resolution of the case overlooks the undisputed physical fact that once Mrs. Watson's car crossed the narrow shoulder on the north side of the "T" intersection and started down the incline she was helpless and there was nothing she could do to stop until she reached the bottom. Had the embankment gone on for a hundred feet further and she ended up in the Missouri River, it would not have been because she was voluntarily doing so, but because there was no way to stop any sooner. The north side of the levee, beyond the shoulder, was "a precipitous declivity", not a gentle, smooth slope. The defendant's brief says it was at a 45° angle and the evidence shows that in the distance of 55 feet traveled by Mrs. Watson the hillside dropped 25 to 30 feet. This is equivalent to a 50% grade. City streets are nowhere near that steep and I doubt if any of us would be willing to attempt to drive a car down a 50% grade even under ideal conditions, much less down a rocky, boulder strewn surface. So I believe it is clear that the 55 feet traveled by Mrs. Watson before she finally crashed to a stop at the foot of the hill was not because she was

engaged in making a complete departure from the intersection, but was because it was inevitable under the physical circumstances that any automobile which left the shoulder at the place where hers did would, by force of gravity, continue ahead and downward until it reached the bottom. In fact, it is surprising she did not go more than 55 feet. It seems to me the city could reasonably anticipate that anyone who ran off the intersection as Mrs. Watson did would travel a minimum of 55 feet. I fail to see where the 55 feet in any way relieves the city of its duty to warn.

The cases which the principal opinion relies upon are from 20 to 45 years old. Automobile traffic has increased tremendously over that period of years. Automobiles now are larger and faster and the streets and highways are more heavily used. What the city could reasonably not have done years ago is not true today. Anyone who drives the highways of Missouri knows the Missouri state highway department routinely erects warning signs of "T" intersections throughout the state. We know that drivers come to rely upon these signs.

In deciding this case there is no need, however, to hold that cities have to erect warning signs at all intersections. We are talking about a particularly dangerous intersection here where it would have been a simple and inexpensive matter to have erected a sign which would have given plaintiff adequate warning of the fact that she was approaching a dead end with a precipitous dropoff where it would be disastrous to go forward. That is all that is before us at the moment. It is significant that when this case was argued before the court en banc one argument advanced by counsel for the city was that plaintiff did not make a hard application of the brakes when she reached the intersection in question. The question arises in the mind of a neutral observer as to why should she have made a hard application of the brakes. We know from common experience that drivers approaching a street intersection do not ordinarily make a hard application of the brakes although they may make a slight application of the brakes as a routine matter while looking to be sure the way is clear before they proceed. The answer is that the only reason why plaintiff would be making a hard application of the brakes as she approached this intersection at a reasonable speed would be to prevent from happening exactly what did happen—going off the road. The reason she did not make a hard application of the brakes is that she had no warning that any such unusual action was necessary. The city expected Mrs. Watson to make a hard application of the brakes when she came to this intersection, but gave her no warning of the need to do so.

For these reasons I respectfully dissent.