·LISA MARIE LUKE, A MINOR, BY CHARLES LUKE,
HER FATHER AND NATURAL GUARDIAN, AND OTHERS
v. CITY OF ANOKA AND OTHERS.

151 N. W. (2d) 429.

May 26, 1967—No. 39,634.

*Robins, Davis & Lyons* and *Stanley E. Karon,* for appellants.

*Meagher, Geer, Markham & Anderson, Roderick D. Blanchard,* and *O. C. Adamson II,* for respondents city of Anoka and Anoka Halloween, Inc.

*Ralph T. Lilly,* for respondent Ekerholm.

ROGOSHESKE, JUSTICE.

The singular issues of the liability based on negligence of each defendant for damages to plaintiffs arising out of a motor vehicle accident were jointly tried and submitted to a jury. By general verdicts, the jury found defendant City of Anoka liable and defendants Anoka Halloween, Inc., and Estate of Otto Erickson, deceased, not liable. Subsequently, in response to multiple motions by plaintiffs for judgment n. o. v. or a new trial against Anoka Halloween and for a new trial against the administrator of the Erickson estate, and motions by defendant city for judgment n. o. v. or a new trial, the court set aside the verdict and granted judgment in favor of the city notwithstanding the verdict. Plaintiffs appeal from the order denying their post-trial motions and from the judgment of no liability subsequently entered.

The tragic accident which gave rise to plaintiffs' claims happened on Main Street in the center of the downtown area of the city of Anoka on the afternoon of October 31, 1961, during Anoka's "children's Halloween parade," one of several events of the city's nationally famous annual celebration of the festival of Halloween. This afternoon parade, inaugurated in 1947, is for youngsters up to the sixth grade and currently attracts huge crowds of up to 30,000 persons. As plaintiffs, including plaintiff Donna Green's decedent, Clementine M. Laird, were watching the parade from various positions along Main Street, they were struck by a runaway automobile when its driver, decedent Otto H. Erickson, suffered a sudden, fatal heart attack.

A reading of the record reveals no conflicts in the testimony relevant to the issue of liability.

The celebration, including the parade, is sponsored and organized by

defendant Anoka Halloween, a nonprofit, private corporation, and financed through contributions from local businessmen and the sale of buttons. The president of the corporation serves as chairman and has "over-all" responsibility for the celebration. He enlists the aid of persons willing to volunteer their services to various committees which plan, organize, and conduct the scheduled events. One of these committees is the "parade patrol" committee, the cochairmanship of which each year is assumed by the Anoka chief of police and the Anoka County sheriff. A function of the committee is to provide for the control of vehicular and pedestrian traffic along the parade route. While the plans formulated by this committee are reported at meetings of the Halloween corporation, traffic control during the parade, including selection of personnel for this purpose, is under the direction of defendant city's police department acting through its chief. The chairman of the Halloween corporation acknowledged that he could not "tell them what to do." The 20 or 22 regular and special uniformed police officers on duty on the day of the accident worked solely under the direction of the police chief. Except for an undisclosed number of civil defense workers who served without pay, the officers were paid their regular or overtime compensation by the city or county, and in addition all were given a steak dinner paid for by the city. In performing their assigned duties, the officers had no connection whatsoever with the Halloween corporation.

The children's parade originated at 1:15 p. m. from the school playground on the west side of the city. The weather was clear and the streets were dry. After leaving the staging area the parade proceeded to Main Street. This street is 48 to 50 feet wide, and the eastbound and westbound lanes are separated by a raised cement divider. The parade proceeded upon the eastbound lanes of Main Street through its intersections with First, Second, and Third Avenues to Fourth Avenue, where it turned south and continued to the Anoka High School. Officers were stationed at each intersection along the parade route. One of the city squad cars was stationed at the intersection of Fifth and Main, where all westbound Main Street traffic was rerouted. The other squad car was at the staging area. These vehicles, together with the

police chief's vehicle, provided radio communication at key points. Pursuant to instructions from the chief of police, after the parade started no traffic was allowed on Main Street until the parade passed, after which vehicular traffic upon the eastbound lane was allowed to resume when the end of the parade had cleared the next intersection, one block away. Spectators lined both sides of Main Street and were permitted to stand across Fourth Avenue and Main Street to view the parade as it turned south on Fourth Avenue. In some prior year or years, a city fire truck followed the last unit of the parade. On this occasion, while the truck had been at the staging area, it left before the parade was over. It was observed, with its siren and emergency lights in operation, traveling east in one of the westbound lanes of Main Street.

Sometime before the accident and before the parade began, one of the officers stationed at the intersection of Fourth Avenue and Main Street observed the Erickson automobile approach Main Street on Fourth Avenue from the south. Mr. Erickson indicated a desire to turn right and proceed east on Main Street. Then alone in his automobile, he presumably wanted to go to a doctor's office a short distance to the east on Main Street where he had previously taken his wife, who testified at the trial that she was expecting him to return for her about 2:30 p. m. By hand signals, the officer prevented Mr. Erickson's right turn and directed him to proceed across Main. Although Mr. Erickson appeared unhappy or "upset" over the restriction, he was neither "excited" nor "angry" and readily complied.

After the last unit of the parade on Main Street was between Third and Fourth Avenues, the Erickson vehicle, headed east on Main Street, approached the Third Avenue intersection. In obedience to the whistle and hand signal of one of the two officers stationed there, Mr. Erickson brought his 1950 straight-stick Plymouth to a complete stop. The traffic semaphore just then changed to red for eastbound traffic. After a brief conference with his companion, one of the officers, intending to follow the parade, began to leave his position in the intersection. Suddenly, the engine of the Erickson vehicle began to roar, the tires squealed, and the vehicle accelerated forward, emitting smoke from under

the hood. Both officers started toward it: and vainly attempted to grab the door handle or steering wheel, but the driver's window was closed and the vehicle was moving too fast — an estimated 10 to 12 miles per hour. Both officers observed Mr. Erickson behind the steering wheel in a "stiffened" position, his head on the back of the front seat and his eyes facing toward the roof of the car. His face was "pale." The vehicle, gaining momentum, was obviously out of control. It veered slightly to the north, jumped the center divider, hit the north curb of Main Street, knocked down a traffic sign standard and a street light pole, and struck pedestrians along the way. It finally came to rest 40 feet east of the Fourth Avenue intersection against the front of an automobile parked along the north curb of Main Street. When it stopped, the rear and left front wheels of the Erickson car were on the boulevard. The officers stationed at this intersection observed no driver behind the wheel as the vehicle passed. When it came to rest, they found Mr. Erickson's lifeless body lying on the front seat and floor of the vehicle. Some of plaintiffs, as spectators, were struck while on the sidewalk or boulevard and some while in the Fourth Avenue intersection.

The undisputed medical testimony established that Mr. Erickson suffered a sudden heart attack, caused by coronary artery disease, when he was stopped at the Third Avenue intersection; that he lost consciousness within 10 or 15 seconds; and that his death followed instantaneously. Although he was under medical treatment for a heart condition for many years, he manifested no signs of illness and made no complaints to his wife before he took her to the doctor's office on that day. He was never advised by his doctor not to drive. In the opinion of his attending doctor, his attack could not be foreseen "on that day" as a person may have this type of "silent infarct" heart attack without experiencing prior distress or discomfort and without any knowledge of the attack. Such an attack can conceivably happen to almost anyone at any time.

Defendant City of Anoka pleaded the defense of governmental immunity from tort liability. Subsequently, but 5 months before trial, the city council, as empowered by statute,[1] unanimously adopted a resolu-

---

[1] Minn. St. 1961, § 465.62, now superseded by Minn. St. 466.06.

tion consenting to the assertion of that defense by its liability insurance carrier.

1. Of the issues raised by plaintiffs, the primary and controlling issue is whether the trial court properly applied the rule of governmental immunity to deny recovery by plaintiffs against defendant City of Anoka. Since this action arose before our 1962 decision in Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 118 N. W. (2d) 795, and the enactment in 1963 of Minn. St. c. 466, relating to tort liability of political subdivisions, the applicable statute governing the liability of the city is Minn. St. 1961, § 465.62, subd. 1.[2] This statute by its terms waives tort immunity, to the extent of liability insurance coverage purchased by the city, "unless the city * * * consents to the assertion of that defense." As the defense pleaded was duly consented to and ratified by the city council,[3] it cannot be disputed that the doctrine of governmental immunity as it prevailed when the action arose was available to the city. However, plaintiffs argue that the doctrine, even though available, is not applicable because plaintiffs' damages were caused by defects or dangerous conditions in the city's streets. We recog-

[2] Minn. St. 1961, § 465.62, subd. 1, provides: "The governing body of any city * * * may procure insurance against liability of the city * * * or of its officers and employees for damages resulting from wrongful acts and omissions of the city * * * and its officers and employees, whether the acts or omissions relate to governmental or proprietary functions of the city * * *. Any independent board or commission in the city * * * having authority to disburse funds for a particular city * * * function without approval of the council may similarly procure liability insurance with respect to the field of its operation. Insofar as this insurance relates to governmental functions of the city * * *, the policy of insurance shall contain a provision under which the insurance company agrees to waive the defense of governmental immunity unless the city * * * consents to the assertion of that defense. The waiver of defense of governmental immunity made pursuant to such provision in the policy of insurance shall not subject the city * * * to liability in excess of the insurance coverage provided by the policy."

[3] The statute does not specify when consent must be expressed. Plaintiffs' objection that it was ineffective because not obtained before the answer was filed is without merit. Cf. Diker v. City of St. Louis Park, 268 Minn. 461, 130 N. W. (2d) 113.

nize the validity of the well-established, safe-street exception to the doctrine of governmental immunity, but we cannot agree that the facts bring this case within that exception. Under the most favorable view of the evidence, the only plausible claims plaintiffs can make are that the city was negligent in failing to stop or hold back traffic a greater distance behind the last unit of the parade and, possibly, in failing to use some type of equipment such as a fire truck to warn or otherwise afford protection from a runaway vehicle. The evidence does not support, nor do plaintiffs claim, that the city was negligent because of any defect in the street itself or in placing any immovable physical obstruction upon or near the street. With but one exception,[4] the host of decisions dealing with the aforesaid common-law rule[5] strictly limit its application to such physical defects or obstructions in a street.[6] Historically, there has been a clear distinction between physical defects in a street and a failure to take proper precautions in controlling and regulating the flow of traffic [7] or a failure to protect pedestrians or users of the streets from vehicles or other hazards which are moving. [8] The city cannot be held liable in this case under the common-law rules, and we are not persuaded that we should modify them.[9]

---

[4] Johnston v. City of East Moline, 405 Ill. 460, 91 N. E. (2d) 401.

[5] Decisions based upon statutes that modified the common-law rule are not relevant. See, e. g., O'Hare v. City of Detroit, 362 Mich. 19, 106 N. W. (2d) 538. There is no such statute in Minnesota.

[6] The following decisions expressly dealt with the same type of issue presently before this court: Locigno v. City of Chicago, 32 Ill. App. (2d) 412, 178 N. E. (2d) 124; Bradley v. City of Oskaloosa, 193 Iowa 1072, 188 N. W. 896; Sandmann v. Sheehan, 279 Ky. 614, 131 S. W. (2d) 484; Carruthers v. City of St. Louis, 341 Mo. 1073, 111 S. W. (2d) 32; Auslander v. City of St. Louis, 332 Mo. 145, 56 S. W. (2d) 778; Hamilton v. Town of Hamlet, 238 N. C. 741, 78 S. E. (2d) 770; Hanson v. Berry, 54 N. D. 487, 209 N. W. 1002, 47 A. L. R. 816; Kirk v. City of Muskogee, 183 Okla. 536, 83 P. (2d) 594.

[7] 18 McQuillin, Municipal Corporations (3 ed. Rev.) § 53.35.

[8] 19 McQuillin, Municipal Corporations (3 ed.) § 54.66.

[9] Prior decisions by this court have not modified this common-law rule since they all involved physical defects or obstructions in the street. See, e. g., Petrich v. Village of Chisholm, 180 Minn. 407, 231 N. W. 14. The decision in Kleopfert v. City of Minneapolis, 93 Minn. 118, 100 N. W. 669, is not to the con-

. Although the trial court correctly applied the rule of immunity, we believe it desirable to note that it could also have directed a verdict in favor of both defendant city and defendant Halloween corporation upon the ground that plaintiffs failed to establish any negligence on the part of either.

With respect to the city, disregarding the doctrine of governmental immunity and assuming the city has a duty to exercise reasonable care in regulating traffic to protect the paraders and spectators from injury, we cannot believe, under the circumstances of this case, that such duty would require the city to take the extraordinary measures necessary to protect the public from the consequences of Mr. Erickson's disastrous heart attack.[10] A municipality, indeed no person, may be held liable for an accident such as this one which could not have been reasonably foreseen or prevented by the exercise of reasonable care.[11] Reasonable care requires taking precautions against ordinary risks or those which can reasonably be anticipated, but no one can be expected to guard against an occurrence which is so unlikely, remote, or improbable that the possibility of such an occurrence is commonly disregarded.[12] In our opinion, therefore, the court would have been justified in directing verdicts in favor of the city and defendant Halloween corporation.[13]

There is likewise no evidence upon which negligence on the part of defendant Halloween corporation can be predicated. Moreover, contrary to plaintiffs' contention, the lack of the corporation's right to control the performance of the city's function of regulating traffic

---

trary. In that case the rope stretched across the street was clearly an obstruction.

[10] Mack v. McGrath, 276 Minn. 419, 150 N. W. (2d) 681.

[11] Prosser, Torts (2 ed.) §§ 29, 30, 49.

[12] Tracey v. City of Minneapolis, 185 Minn. 380, 241 N. W. 390; Briglia v. City of St. Paul, 134 Minn. 97, 158 N. W. 794, L. R. A. 1916F, 1216; Boyd v. City of Duluth, 126 Minn. 33, 147 N. W. 710.

[13] Plaintiffs' attempt in their reply brief to assert for the first time that the city is liable on the theory of creating a nuisance not only cannot be considered under fundamental rules governing appellate review but is clearly without merit. 25 Am. Jur., Highways, § 116.

appears as a matter of law, and therefore the Anoka chief of police could not have been acting as its agent.

2. On the final issue raised by plaintiffs, we find no prejudicial error in the court's exclusion, upon the claim of privilege, of the 1957 hospital records of decedent Erickson. It is not clear that such records or some of them were not in fact before the jury. However, if under the rule of Maas v. Midway Chevrolet Co. 219 Minn. 461, 18 N. W. (2d) 233, 158 A.L.R. 215, it was error to exclude the records, we fail to comprehend the significance since more recent and relevant detailed medical records were introduced. Plaintiffs have wholly failed to show in what manner the exclusion hampered presentation of their case. Thus, a new trial against defendant Erickson's estate is unwarranted.[14]

Affirmed.

---

[14] Mutual Serv. Cas. Ins. Co. v. Overholser, 239 Minn. 243, 58 N. W. (2d) 268.